James Michael DAVIS, Appellant,

v.

The STATE of Texas, State.

No. 2-96-223-CR.

Court of Appeals of Texas, Fort Worth.

Aug. 28, 1997.

Rehearing Overruled Dec. 4, 1997.

Vincent W. Perini, Dallas, for Appellant.

Tim Curry, Criminal District Attorney, Charles Mallin, Chief of the Appellate Section, Edward L. Wilkinson, Assistant Criminal District Attorney, Mitch Poe, Assistant Criminal District Attorney, Reed O'Connor, Assistant Criminal District Attorney, Fort Worth, for Appellee.

Before DAY, BRIGHAM and HOLMAN, JJ.

## OPINION

BRIGHAM, Justice.

Appellant James Michael Davis, a periodontist and oral surgeon, was convicted by a jury of the involuntary manslaughter of a patient with a deadly weapon finding and was sentenced to five years in prison. In 56 points of error, he complains of the admission of extraneous acts evidence, jury charge error, failure to grant a mistrial, the deadly weapon finding, and double jeopardy. We affirm the trial court's judgment.

### The Indictment

A Tarrant County Grand Jury indicted Appellant for

> recklessly caus[ing] the death of . . . Richard Garland, by administering to Richard Garland excessive sedation, to-wit: Versed and Demerol or a combination of both, and administering to Richard Garland excessive sedation without having adequately trained personnel to monitor Richard Garland and failing to administer oxygen to Richard Garland, a sedated patient and failing to monitor Richard Garland's respiratory status and failing to have adequate equipment to monitor the amount of oxygen in Richard Garland's blood and failing to recognize Richard Garland's respiratory deficiency in a timely manner and failing to abort the procedure when Richard Garland developed an airway compromise and failing to supply positive administration of oxygen to Richard Garland in a timely manner and failing to perform proper resuscitative procedures and administering deep sedation without possessing the required education, training and certification.

### The Facts

In January 1989 Appellant applied for a new license to place patients in a state of conscious sedation to perform oral surgery. Conscious sedation is a state in which the patient, though sedated, retains sufficient consciousness to respond to verbal stimuli. Because he had been performing conscious sedations before new licensing requirements were enacted, Appellant was allowed to perform them until the licensing board either rejected or approved his recent application. Appellant did not represent to the licensing board that he had the requisite training to perform any other kind of sedation besides conscious sedation or that he had the neces-

sary monitoring equipment, emergency equipment, and emergency training to perform deep sedation or general anesthesia. But he did represent that if he performed conscious sedations intravenously, he would monitor the patient in the same manner as if he were performing deep sedation or general anesthesia. Appellant had done a rotation in anesthesia and a rotation in an emergency room as part of his medical training and thus was familiar with the basic requirements of general anesthesia.

Versed, a drug "in the Valium class," is sometimes administered instead of Valium by oral surgeons performing conscious sedations to relieve a patient's anxiety. Demerol, a narcotic, is used to sedate patients and to relieve pain. Combining the two substances make each "stronger than they were, [than] either one of them would be, separately," according to Dr. Milburn Hilley, Jr., an expert witness for the State.

Versed had the known side effect of causing respiratory depression, which in turn could lead to hypoxia (a lack of oxygen in the blood) and result in cardiovascular depression, hypotension, and eventually cardiac arrest if not promptly treated. Several deaths had been attributed to Versed overdoses when it was first introduced for use.

Because of the potential dangers, Versed's manufacturer had issued specific instructions regarding its administration. The manufacturer recommended that the drug be given intravenously "only in a hospital ambulatory care setting, including physician's offices that provide for continuous monitoring of respiratory and cardiac function." The only nonevasive way to monitor a patient's respiration and heart rate at the time was through the use of a pulse oximeter, a device that measures the amount of oxygen in the patient's blood, and an EKG machine, which tracks the patient's cardiac rhythm.

The manufacturer further recommended that "[i]mmediate availability of resuscitative drugs and equipment and personnel trained in their use should be assured." In addition, it recommended that the initial intravenous dose for conscious sedation "may be as little as one milligram but should not exceed 2.5 milligrams in a normal healthy adult." The manufacturer further warned that in patients receiving other "narcotics or other central nervous system depressants," lower doses "may be necessary."

Additional warnings included the instruction that Versed should "never be used without individualization of dosage"; that "prior to the intravenous administration of Versed in any dose, the immediate availability of oxygen and resuscitative equipment for the maintenance of a patent airway and supportive ventilation should be ensured"; that the patient "should be continuously monitored for early signs of under ventilation or apnea which can lead to hypoxia or cardiac arrest unless effective countermeasures are taken immediately"; and that the drug "should be administered as an induction agent only by a person trained in general anesthesia and should be used in conscious sedation only when a person skilled in maintaining a patent airway and supporting ventilation is present." The manufacturer further cautioned that when used for conscious sedation, Versed should not be intravenously administered by the bolus method, which is quickly "pushing" the drug into the patient's venous system. These warnings were included in "scoop sheets" packaged with the Versed and in the Physician's Desk Reference, or "PDR."

Appellant had been giving the same initial dosage—10 milligrams of Versed and 100 milligrams of Demerol—to each of his patients, along with a "maintenance dose" later, and all had been rendered unable to respond to commands or to communicate. Between one-third and one-half of Appellant's patients had to be revived with the use of Narcan, an antinarcotic emergency drug for over-sedation, and nearly all had to be wheeled out of Appellant's office unconscious after surgery.

A manufacturer's representative had personally informed Appellant that he had been administering overdoses of Versed to his patients, but Martha Alvarado, one of Appellant's dental assistants, said that Appellant's only reaction was to laugh. Appellant's insistence on continuing to administer the same dosages even after the drug manufacturer's representative had informed him that the

doses were excessive had already prompted Alvarado to give Appellant notice that she was leaving his employ.

Despite having subjected a majority of patients to whom he administered Versed to deep sedation, a level of sedation beyond conscious sedation that posed greater risks and required additional training and safety measures to properly administer, Appellant did not train his staff in emergency procedures. Appellant's dental assistants, and apparently Appellant, were not certified in CPR, and the dental assistants were not trained in how to maintain a patient's airway in the event that the patient suffered respiratory problems. Furthermore, the only monitoring equipment that Appellant had was a blood pressure monitor; he did not have a pulse oximeter, oxygen, an oral airway tube, or other emergency resuscitative equipment readily available.

On August 21, 1989, Appellant began his second dental procedure of the morning on 32–year–old Greg Garland, a father of two and stepfather to his wife's son from another marriage. Before beginning to sedate Garland, Appellant had just had difficulty in reviving his first patient of the day, a 16–year–old boy, from a "substantial overdose" of Versed, Demerol, and Phenergan.[1] Appellant had to administer multiple doses of Narcan to revive the boy.

In preparation for Garland's surgery, Alvarado, the dental assistant, checked to see if the two syringes to be used in sedating Garland contained the same dosages that Appellant always used: one syringe with two cc.'s (10 milligrams) of Versed and two cc.'s (100 milligrams) of Demerol. Alvarado tied Garland's arms down—Appellant had devised his own restraints using towels because the Velcro straps he had tried using "would come off very easily"—hooked the blood pressure cuff to Garland, checked its initial reading, and informed Appellant that "he was ready to go." The blood pressure monitor was set to check the patient's blood pressure every three minutes; in addition, it had an alarm to warn if the patient's blood pressure rose too high or dropped too low. Appellant had been

having problems with the machine several days earlier—it had been giving "false readings"—but Appellant continued to use it.

Appellant began the sedation procedure by inserting an IV into Garland's arm. He then picked up the syringe containing Demerol, added 25 milligrams of Phenergan to it, and administered half the Demerol to Garland through the IV in a bolus. He switched to the syringe of Versed, administered the entire 10 milligrams in an IV push, and switched back to the syringe of Demerol and administered the remaining 50 milligrams. Appellant did not pause between doses, and the entire process took less than five minutes.

Garland was "out" in a matter of minutes. His eyes were closed, he was breathing heavily as though he were asleep, and, when Alvarado attempted to talk to him, he did not respond. Appellant then locally anesthetized the upper right quadrant of Garland's mouth before beginning the oral surgery.

Approximately 25 minutes after the procedure began, and shortly after Appellant had applied the anesthetic, Garland began "moving around quite a bit," though he was not awake; his eyes were closed, and he did not respond to Alvarado's verbal attempts to calm him. As Garland "thrashed" his head about and moved his arms in the chair, he knocked the IV from his arm.

Appellant became visibly frustrated and angry. Cursing, he roughly forced Garland's arm down and retied the restraint "probably as tight as he could," according to Alvarado, and reinserted the IV. He then withdrew another dose of Versed, possibly as much as 5 milligrams, and administered it through the IV in a bolus. Garland stopped moving and did not respond to any verbal stimuli. He appeared "asleep, very passive," and there was nothing to indicate that he was conscious. After Appellant had finished the first two quadrants and had started working on the third, Garland began choking and having trouble breathing. He "was not gasping," but it was "obvious" that he was "trying to draw air and he couldn't," accord-

---

**1.** Phenergan is a drug used to prevent patients from vomiting during oral surgery. When combined with Versed and Demerol, Phenergan increases the effect of both.

ing to Alvarado. "Scared," Alvarado asked Appellant what was happening. As Appellant and Alvarado repositioned Garland's head and attempted to retract his tongue, Appellant explained that Garland had suffered a laryngospasm.

Approximately 7 to 10 minutes later, Garland began to choke again. In response, according to Alvarado, Appellant administered yet a third dose of Versed. Garland began to turn a dark, "almost purplish" color and did not move. Alvarado pointed out that Garland "didn't look right" and observed that she had never seen a patient that color before. Appellant, not "alarmed in the least," reassured her that Garland was "fine."

Concerned about the gasping sounds coming from the room, Dora King, Appellant's other dental assistant, who had been working for Appellant for two years, walked into the room and, like Alvarado, became concerned about Garland's purple discoloration.

Fran Russell, Appellant's office manager, upon hearing a "gurgling noise" that sounded "like there was not air passing through the airway," also "stuck" her head into the room and asked if everything was "going all right." She, too, noticed that Appellant's color was not "normal." Assured by Appellant that nothing was wrong, she returned to her work.

But shortly after, when she heard another noise, "a kind of spasm," she "got [a] kind of funny feeling." Immediately, Appellant called her name. As she entered the room, she saw Appellant and Alvarado "working" on Garland, who was lying in the chair discolored and lifeless. Appellant declared that there was a "problem" and instructed her to get Dr. Abdo, a physician and also Appellant's personal friend, from his office downstairs. The manager asked if she should call the emergency room of the hospital next door, but Appellant insisted that she simply get Dr. Abdo.

After Garland had choked a second time, Alvarado pointed out that there was no reading on the blood pressure monitor and said that she did not think Garland was breathing. Appellant stood up, called to Garland, and shook him on the shoulder. When Garland

didn't respond, Appellant instructed Alvarado to get the "ambu bag"—a device to force air down a patient's throat, but which did not have a tracheal tube—which she had never been shown how to use. The alarm on the blood pressure monitor did not sound at any time during the entire procedure. Alvarado later discovered that the alarm setting had been turned to zero.

The ambu bag was difficult to use on Garland, so Appellant took it from Alvarado and ordered her to go to the next room and retrieve an oxygen tank. As they began using the oxygen, Alvarado could not feel Garland's pulse.

When Dr. Abdo arrived from downstairs, he immediately checked Garland's vital signs using a stethoscope. Declaring that he could find neither a pulse nor hear a heartbeat, he ordered the office manager who had brought him to call the emergency room of the hospital.

Dr. Jesus Ramirez, a doctor from the emergency room at All Saints Cityview Hospital, which was annexed to Appellant's office building and connected to it by a walkway, appeared in Appellant's office within one or two minutes, though the call had not come in as a "code" call, which would have mobilized the entire emergency room staff. He found Appellant trying to administer Sodium Bicarbonate—not the first or second drug usually administered in such an emergency, according to Dr. Ramirez—to a "limp, if not lifeless individual on a chair"; Appellant was not performing CPR. Dr. Ramirez checked for any response from Garland, but he "didn't respond to anything," which implied to Dr. Ramirez that he "had been down for a while." Dr. Ramirez also immediately noticed that the blood in Garland's mouth was "black-red," indicating that it was not oxygenated and suggesting that Garland had been "down for at least a little while" because it takes a period of time for blood to turn that color. With the help of Dr. Abdo, Dr. Ramirez began to perform CPR and ordered one of the dental assistants to "call code," remarking in passing that Garland "looked like he'd been gone for a long time." Because Appellant did not have a "crash cart" or emergency medical equipment avail-

able, Dr. Ramirez had to wait a few minutes until the emergency room staff arrived with the hospital's crash cart before he could administer any emergency medication.

In an attempt to diagnose Garland, Dr. Ramirez asked Appellant what drugs he had administered. Appellant did not respond but simply gazed down at Garland's body and handed Dr. Ramirez Garland's dental records, which did not contain any information about the sedation Appellant had performed.

Dr. Ramirez and the emergency staff tried a number of methods to restore Garland's vital signs, including the use of defibrillator paddles. Garland's muscles did not contract when he was hit with the defibrillator, which indicated that he had been "down for a long time;" Dr. Ramirez likened it to "trying to shock a dead body." Despite Dr. Ramirez's efforts, Garland could not be revived, and attempts to resuscitate him were abandoned.

That afternoon, Ed Bodiford, an investigator from the Tarrant County Medical Examiner's Office, interviewed Appellant about the sedation he had performed on Garland. Appellant assured Bodiford that he had used a pulse oximeter during the sedation and dental procedure, though Bodiford did not see one in the operatory and Appellant did not actually buy one until a week later. Appellant told Bodiford that he had initially administered "10 milligrams of Versed, IV push; 100 milligrams of Demerol, IV push; Phenergan, 25 milligrams, IV push; and then Decadron, 8 milligrams, IV push." He added that he had administered a second dose of 50 milligrams of Demerol and 12.5 milligrams of Phenergan during the procedure. Appellant did not provide copies of any documentation of the procedure because none had been made.

Several days later, Appellant called Bodiford and told him that "he had thought about the medications" that he had given and had concluded that the dosages that he had claimed to have initially administered were not correct. He claimed that instead of administering a dose of 10 milligrams of Versed, as he had originally told the investigator, he had instead administered an initial

dose of 7.5 milligrams of Versed, had waited 30 minutes, and had then administered the Demerol and another 5 milligrams of Versed.

About three days after Garland's death, Appellant called a meeting of his staff to pass on "some information ... about what had happened." Appellant declared that Garland had a heart condition that no one knew of and absolved himself of any fault. After the meeting, Appellant approached Alvarado and said: "If they ask you how much...." Not wanting to talk about it, she cut him off from finishing his statement.

Garland's autopsy revealed that his blood contained more than twice the minimum lethal dose of Demerol and twice the minimum lethal dose of Versed. Either dose alone could have proved fatal, according to Dr. Nizam Peerwani, the Tarrant County Medical Examiner. Dr. Peerwani pronounced Garland's cause of death as "acute mixed-drug intoxication due to both Demerol and Versed," explaining that the overdose caused respiratory depression, which led to hypoxia, which resulted in a swelling of Garland's brain and ultimately in cardiac arrest and death. Garland's death did not occur quickly, but consisted of a "prolonged" process that went on "for an hour or two."

At trial Appellant admitted that his monitoring techniques were "atrocious" and that his monitoring of Garland created "an unjustifiable risk to the lives of" Garland and other patients. Appellant also admitted that he "should have known" that the risk was of "such a nature and degree ... that it ... constitutes a gross deviation from the standard of care of an ordinary person" of his background and training.

### Extraneous Acts

■ In points of error 1 and 5 through 45, Appellant complains that the trial court erroneously admitted evidence of alleged extraneous acts or wrongs. For simplicity, these complaints are grouped in the following 10 categories:

1. Evidence and testimony about Appellant's Dental Board Application (points of error 1, 13, 24, 30, 32–33, and 45).[2]

2. For example, Appellant's application, which he

complaints of in point of error 1, required him to

2. Evidence and testimony about Appellant's deviation from the applicable standard of care in sedating Garland (points of error 33 and 36).

3. Evidence and testimony about the lack of CPR certification of Appellant's staff and Appellant's own lack of certification in cardiac life support (points of error 5, 29, and 41–42).

4. Evidence and testimony about the lack of emergency training of Appellant's staff (points of error 6–7, 29, and 39).

5. Evidence and testimony about whether Appellant administered conscious sedation or general anesthesia, whether he was supposed to have administered conscious sedation or general anesthesia, and Appellant's deviation from the standard of care for administering conscious sedation (points of error 8, 31, 34, and 37).

6. Evidence and testimony about Appellant's failure to warn Garland of the possible complications from the sedation per-

formed and his failure to obtain Garland's informed consent (points of error 9 and 26).[3]

7. Evidence and testimony concerning Appellant's failure to perform the sedation of Garland with a pulse oximeter and an EKG machine and his failure to properly monitor the victim while the victim was sedated, including his using a malfunctioning blood pressure monitor during the procedure (points of error 10–12, 18, 22, 25, 35, 43–44).

8. Evidence and testimony about whether Appellant properly sought emergency medical aid from medical emergency personnel and whether he properly had medical emergency equipment readily available (points of error 14, 17, 21, and 23).

9. Evidence and testimony about whether Appellant took the proper emergency medical measures once he became aware that Garland was suffering a medical emergency (points of error 15,[4] 16, and 19 [5]).

---

state, as a condition precedent to performing conscious sedation, that he would:

- maintain a current history and limited physical examination on patients
- maintain emergency equipment appropriate for patient resuscitation
- provide training on emergency procedures to his staff
- maintain current certification on basic life support for himself and his staff
- maintain personal supervision of the inhalation conscious sedation procedure
- utilize an informed consent for conscious sedation procedures
- maintain adequate written sedation records for conscious sedation procedures
- maintain direct supervision of conscious sedation procedures
- maintain adequate vital sign monitoring on the patient
- maintain assistants who are capable of assisting in emergencies incident to conscious sedation.

**3.** In point of error 9, Appellant complains about a question asked about an exhibit and issue introduced by the defense—what Garland had been told about the sedation and the surgery. Also, Appellant testified that he "should have informed [Garland] more fully." Error, if any (we hold below that no error occurred), was therefore waived. *See Hughes v. State,* 878 S.W.2d 142, 156 (Tex.Crim.App.1992) (op. on reh'g), *cert. denied,* 511 U.S. 1152, 114 S.Ct. 2184, 128 L.Ed.2d 902 (1994). Likewise, in point of error 26, Appellant complains of a question where his objec-

tion was sustained, at least in part, and by not requesting an instruction to disregard or moving for a mistrial, he did not preserve error, if any. *See Cook v. State,* 858 S.W.2d 467, 473 (Tex. Crim.App.1993). Further, because the trial court overruled the objection only to the extent that the question addressed facts already in evidence without objection, error, if any, was waived. *See Hughes,* 878 S.W.2d at 156.

**4.** Because the evidence complained of in point of error 15 was never admitted because the question was not answered after Appellant's objection was overruled, Appellant has nothing to complain about on appeal in point of error 15.

**5.** In point of error 19, Appellant complains of testimony about his failure to respond to questions by emergency personnel about what drugs he had given Garland while attempts were made to resuscitate Garland. That evidence, which we hold below was properly admitted, was also admissible to show Appellant's consciousness of guilt—Appellant's awareness that he had oversedated Garland and had caused the emergency—which is a recognized exception to rule 404(b). *See Ransom v. State,* 920 S.W.2d 288, 299 (Tex.Crim.App.1994) (op. on reh'g), *cert. denied,* —— U.S. ——, 117 S.Ct. 587, 136 L.Ed.2d 516 (1996); *Peoples v. State,* 874 S.W.2d 804, 809 (Tex.App.—Fort Worth 1994, pet. ref'd). This same principle applies to point of error 14, where Appellant complains about testimony that he did not call a "code" for Garland's emergency situation that Appellant had created.

10. Evidence and testimony about whether Appellant properly kept written records of Garland's sedation and surgery (points of error 20, 27–28, 38, and 40).

■ The standard of review of a trial court's ruling on the admissibility of evidence is abuse of discretion. *See Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App. 1990) (op. on reh'g); *Bisby v. State,* 907 S.W.2d 949, 953 (Tex.App.—Fort Worth 1995, pet. ref'd). A trial court's ruling on the admissibility of evidence will be overturned only if the ruling is so clearly wrong that it lies outside the zone of reasonable disagreement. *See Montgomery,* 810 S.W.2d at 391.

■ Texas Rule of Criminal Evidence 404(b) provides:

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case in chief such evidence other than that arising in the same transaction.

Tex.R.Crim. Evid. 404(b). But the list of exceptions in rule 404(b) "is neither exclusive nor collectively exhaustive." *Rogers v. State,* 853 S.W.2d 29, 33 (Tex.Crim.App.1993) (op. on reh'g). If evidence is relevant to any issue in a case "apart from or beyond" its tendency to prove the defendant's character to show that he acted in conformity with it, rule 404(b) does not bar its admission. *See McFarland v. State,* 845 S.W.2d 824, 837 (Tex.Crim.App.1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993); *see also Alba v. State,* 905 S.W.2d 581, 585 (Tex.Crim.App.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996).

■ Appellant's basic complaint is that the only issue that the State had to prove was whether Appellant over-sedated Garland.[6] That argument, however, is overly simplistic and misses the mark, given the allegations in the indictment and the evidence offered to prove those allegations beyond a reasonable doubt.

The Penal Code required the State to prove Appellant's culpable mental state applicable to his offense beyond a reasonable doubt. *See* Tex. Penal Code Ann. § 6.02 (Vernon 1994); *Honeycutt v. State,* 627 S.W.2d 417, 421 (Tex.Crim.App. [Panel Op.] 1981); *Thomas v. State,* 886 S.W.2d 388, 391 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd). Appellant was charged with involuntary manslaughter—that he "did then and there *recklessly* cause the death of an individual, Richard Garland, by administering to Richard Garland excessive sedation." [Emphasis added.] *See* Tex. Penal Code Ann. § 19.04(a) (Vernon 1994) ("A person commits an offense if he recklessly causes the death of an individual.").

■ The State thus had the burden to prove Appellant's culpable mental state of "recklessly" beyond a reasonable doubt. *See, e.g., Thomas,* 886 S.W.2d at 391. A person

acts recklessly, or is reckless, with respect to the circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex. Penal Code Ann. § 6.03(c) (Vernon 1994). The culpable mental state of "reckless" is satisfied by evidence indicating that the defendant "consciously disregarded a known[,] substantial[,] and unjustifiable risk that [the] serious bodily injury would occur;

---

6. Appellant states in his brief:

The jury had to determine whether the patient had been given too much of the drugs Versed, Demerol, or a combination of both. Whether there was resuscitation equipment available, whether the dentist's certification for emergency resuscitation, or that of his staff, were current, etc., need not have been discussed.

a risk that if disregarded constitutes a gross deviation from the standard of care an ordinary person would exercise under the same circumstances." *Johnson v. State,* 915 S.W.2d 653, 658 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd); *see Hayes v. State,* 728 S.W.2d 804, 809 (Tex.Crim.App.1987) (op. on reh'g). Reckless conduct "involves conscious risk creation, that is, [that] the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk." *Aliff v. State,* 627 S.W.2d 166, 171 (Tex.Crim.App.1982).

■ Circumstantial evidence is generally needed to prove a culpable mental state, and because the culpable mental state generally must be inferred from the circumstances surrounding the offense, the trier of fact may infer the defendant's culpable mental state from relevant evidence tending to prove its existence. *See Hernandez v. State,* 819 S.W.2d 806, 810 (Tex.Crim.App.1991), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992); *Dillon v. State,* 574 S.W.2d 92, 94 (Tex.Crim.App. [Panel Op.] 1978); *Skillern v. State,* 890 S.W.2d 849, 880 (Tex.App.—Austin 1994, pet. ref'd).

■ In this case the State had the burden of proving, through direct or circumstantial evidence, that Appellant was "aware of but consciously disregard[ed] a substantial and unjustifiable risk" that serious bodily injury to Garland would occur from Appellant's sedation of Garland. *See* Tex. Penal Code Ann. § 6.03(c); *Johnson,* 915 S.W.2d at 658–59. Direct or circumstantial evidence (1) establishing the substantial and unjustifiable risks surrounding Appellant's conduct and the degree of those risks or (2) proving Appellant's awareness of and disregard for those risks, was highly relevant to Appellant's culpable mental state during the commission of the offense.

Plainly, to prove recklessness, apart from the evidence that Appellant did over-sedate Garland, the State had to present evidence of the conditions and circumstances under which Appellant over-sedated Garland. That evidence, which we have carefully reviewed, was not barred by rule 404(b), even if it had a tendency to prove Appellant's character, because the evidence was highly relevant

"apart from and beyond" the issue of Appellant's character conformity. *See McFarland,* 845 S.W.2d at 837. "In logic and common experience," the evidence complained of tended to "serve some purpose other than character conformity to make the existence of a fact of consequence more or less probable than it would be without the evidence." *Montgomery,* 810 S.W.2d at 391. All of the evidence in the 10 categories was relevant to Appellant's state of mind—his recklessness—and tended to establish:

- whether a risk of serious bodily injury to Garland existed from Appellant's sedation of Garland under the conditions and circumstances that it was performed;

- whether the risk of serious bodily injury was substantial and unjustifiable under the conditions and circumstances that the sedation was performed;

- whether the risk was of such a nature and degree that its disregard was a gross deviation from the standard of care that an ordinary person would have exercised under all of the circumstances as viewed *from* Appellant's standpoint; and

- whether Appellant was aware of but consciously disregarded the risk.

We hold that the trial court did not err or abuse its discretion in admitting the evidence complained of in points of error 1 and 5 through 45, and we overrule those points of error. We also hold that the trial court did not err in refusing to give limiting instructions to the jury about the evidence complained of in points of error 1 and 5 through 45 because that evidence was not evidence of extraneous acts, as we have held. Thus, we overrule those points of error on that basis as well. We also overrule point of error 3, which specifically complains of the trial court's refusal to give a limiting instruction on Appellant's application, and point of error 46, which specifically complains that the trial court's refusal to give limiting instructions about the evidence complained of in points of error 1 and 5 through 45 was reversible, cumulative error.

Related to his extraneous acts complaints, in points of error 4, 48, 49, and 50, Appellant

complains about a limiting instruction in the charge that the jury could consider evidence of Appellant's noncompliance with state dental board rules in determining Appellant's state of mind.[7] Appellant complains that the instruction failed to admonish the jury not to consider Appellant's noncompliance with the rules as proof of Appellant's "reckless or negligent character generally," that the instruction failed to identify "recklessness or negligence as the character for which the evidence could not be considered," and that the instruction should have admonished the jury "against drawing inferences upon inferences from such evidence."

■ Because, as we have held, the trial court properly admitted evidence of Appellant's noncompliance with the dental board rules as proof of Appellant's culpable mental state, the trial court also properly limited the jury's use of that evidence to that purpose in the instruction. When a limiting instruction is given, the trial court should instruct the jury that the evidence is limited to the specific purpose that the proponent advocated for it. *See Taylor v. State*, 920 S.W.2d 319, 323 (Tex.Crim.App.), *cert. denied*, — U.S. —, 117 S.Ct. 364, 136 L.Ed.2d 255 (1996). Because the State offered evidence of Appellant's noncompliance with the rules to prove his culpable mental state of recklessness, the instruction was not erroneous. *See id.* Instead, failure to give such a limiting instruction would have been error. *See Hutch v. State*, 922 S.W.2d 166, 170 (Tex.Crim.App. 1996). The instruction also correctly admonished the jury that evidence of Appellant's noncompliance with the rules "may not be considered to prove the character of the Defendant in order to show he acted in conformity therewith," and the jury is presumed

to have followed that instruction. *See id.* We overrule points of error 4, 48, and 49.

■ In support of his complaint about the failure to admonish the jury about "drawing inferences upon inferences," Appellant does not cite to anything in the record or to any authority requiring or warranting such an instruction. Because Appellant has failed to adequately brief this argument, we overrule point of error 50. *See* Tex.R.App. P. 74(f); *Lawton v. State*, 913 S.W.2d 542, 554 (Tex.Crim.App.1995), *cert. denied*, — U.S. —, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996); *State v. Gonzalez*, 855 S.W.2d 692, 697 (Tex. Crim.App.1993).

■ In point of error 2, Appellant complains that the trial court erred in admitting Appellant's application because, under Texas Rule of Criminal Evidence 403, its probative value was outweighed by unfair prejudice. In points of error 6, 8, and 9, Appellant makes the same complaint on Alvarado's testimony about her training for emergencies, whether Appellant was supposed to be administering general anesthesia, and whether Appellant had warned Garland about the danger of brain damage.[8]

Rule 403 requires a trial court to exclude otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice...." Tex. R.Crim. Evid. 403. We have already held that the complained-of evidence was relevant and that the trial court properly admitted it against Appellant's rule 404(b) objections. We likewise hold that the trial court did not err or abuse its discretion in admitting the complained-of evidence under rule 403, and the trial court's rulings under rule 403 were certainly within the zone of reasonable disagreement. *See Montgomery*, 810 S.W.2d at

---

7. The jury charge included the following instruction:

You are instructed that if there is any testimony before you in this case regarding the Defendant's non-compliance, if any, with the rules or regulations of the Texas State Board of Dental Examiners, you cannot consider such testimony for any purpose unless you find and believe beyond a reasonable doubt that the Defendant was in fact in non-compliance, if he was, and even then you may only consider the same in determining the knowledge or state of

mind of the Defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose. This testimony may not be considered to prove the character of the Defendant in order to show he acted in conformity therewith.

8. Although Appellant's rule 403 complaints within points of error 6, 8, and 9 render those points multifarious, we nevertheless will consider them with point of error 2.

391. We overrule point of error 2, and we additionally overrule points of error 6, 8, and 9 on this basis as well.

In point of error 47, Appellant asserts that if the errors complained of in points of error 1 through 45 are deemed to be harmless error when viewed individually, the cumulative effect of those errors is not harmless. Because we did not find error in points of error 1 through 45, we necessarily overrule point of error 47.

### Mistake of Fact

■■■ The trial court instructed the jury on the defense of mistake of fact on whether Appellant, "through mistake, formed a reasonable belief that the amount of sedation he gave to Richard Garland would not endanger Richard Garland's life...." In point of error 51, Appellant complains that the trial court erred in rejecting, in the mistake of fact instruction, his request on his allegedly mistaken belief that Garland was "in good health without perilous heart disease which made the sedation administered more dangerous than otherwise...."

The fact issue of whether Garland suffered from "perilous heart disease" was hotly contested at trial. One of the State's experts testified that while Garland suffered from coronary blockage, his heart disease was not life-threatening—Garland had a 95% chance of living at least 4 more years and a 90% chance of living at least 8 more years. Appellant's expert, on the other hand, testified that Garland's heart disease was immediately "life-threatening" and "perilous."

■■■ A trial court is prohibited from commenting on the weight of the evidence to the jury. *See* TEX.CODE CRIM. PROC. ANN. arts. 36.14, 38.05 (Vernon 1981); *Atkinson v. State*, 923 S.W.2d 21, 24 (Tex.Crim.App. 1996). A jury instruction that comments on the weight of the evidence or that assumes a disputed fact is impermissible. *See Whaley v. State*, 717 S.W.2d 26, 32 (Tex.Crim.App. 1986); *Grady v. State*, 634 S.W.2d 316, 317 (Tex.Crim.App. [Panel Op.] 1982). Because instructing the jury on Appellant's claim of

Garland's "perilous heart disease," as Appellant requested, was a disputed fact, such an instruction would have been an impermissible comment on the weight of the evidence. The trial court correctly rejected Appellant's requested instruction. We overrule point of error 51.

### Loaded-gun Hypothetical

■■■ During the examination of Dr. Hilley, one of the State's experts, the State asked him:

Would there be any difference, Doctor, in a dentist using a drug like Versed in combination with two other central nervous system depressants on a patient in the doses we've been talking about without knowing, without taking the time to know, would there be any difference in that than taking a loaded .45, putting three bullets in it, spinning it and pointing it at the head of a child and pulling the trigger?

Appellant objected on the grounds that the question was "totally inappropriate, highly prejudicial," and the trial court sustained the objection.[9] The trial court then instructed the jury to disregard the question and also stated "motion for mistrial is denied," although Appellant had neither requested an instruction to disregard nor moved for a mistrial. The State asserts that the question was apparently asked to show that Appellant could not have made a mistake of fact about the proper dosages given to Garland because it was unreasonable to have given them to Garland without knowing their effects.

In point of error 52, Appellant claims that the trial court erred in not granting a mistrial. Because the trial court's instruction to disregard the question cured the error, if any, we overrule point of error 52. *See Faulkner v. State*, 940 S.W.2d 308, 312–15 (Tex.App.—Fort Worth 1997, pet. ref'd) (en banc) (op. on reh'g); *see also Dinkins v. State*, 894 S.W.2d 330, 357 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995); *Waldo v. State*, 746 S.W.2d 750, 754 (Tex.Crim.App.1988).

---

9. Relevant to this point, later in the trial Appellant admitted on cross-examination that he was aware that "the drugs you give in anesthesia are just as dangerous as a loaded gun."

## Deadly Weapon Finding

■ With its original indictment against Appellant, the State filed a notice of intent to seek a deadly weapon finding on Appellant's use or intended use of Versed. The trial court granted Appellant's motion to quash the original indictment. Although the State did not file a second notice of intent to seek a deadly weapon finding, the new indictment alleged that Appellant did "recklessly cause the death of ... Richard Garland, by administering to Richard Garland excessive sedation, to-wit: Versed and Demerol or a combination of both...." The jury found that Appellant used a deadly weapon—Versed or Demerol or a combination of both—and the trial court included a deadly weapon finding in the judgment.

■ In point of error 53, Appellant claims that the trial court erred in submitting the deadly weapon issue to the jury on the use of "Versed or Demerol or a combination of both" because notice was only provided on an intent to seek a deadly weapon finding on Versed only. An accused is entitled to notice in some form that the State intends to seek a deadly weapon finding. *See Grettenberg v. State,* 790 S.W.2d 613, 614 (Tex.Crim.App. 1990); *Judd v. State,* 923 S.W.2d 135, 140 (Tex.App.—Fort Worth 1996, pet. ref'd). Notice in this context involves only whether the accused was apprised before trial "that there will be a deadly weapon issue in the case." *Ex parte Beck,* 769 S.W.2d 525, 527 (Tex.Crim.App.1989); *see also Whatley v. State,* 946 S.W.2d 73, 75–76 (Tex.Crim.App. 1997).

In this case, the notice filed with the first indictment and, most importantly, the specific allegations in the second indictment, were sufficient to adequately apprise Appellant of the deadly weapon issue. *See Gilbert v. State,* 769 S.W.2d 535, 536–37 (Tex.Crim.App. 1989); *Beck,* 769 S.W.2d at 526–27; *Judd,* 923 S.W.2d at 140; *see also Whatley,* 946 S.W.2d at 75–76. Thus, the trial court correctly submitted the deadly weapon finding to the jury, and we overrule point of error 53.

■ In point of error 54, Appellant claims that the evidence is insufficient to support the deadly weapon finding because there is no evidence that he intended to kill Garland and he was convicted of involuntary manslaughter, which requires a culpable mental state of recklessness. *See* Tex. Penal Code Ann. § 6.03(c). But the court of criminal appeals has recently held that deadly weapon findings are appropriate in involuntary manslaughter cases where the defendants lacked the specific intent to kill. *See Walker v. State,* 897 S.W.2d 812, 814 (Tex. Crim.App.1995); *Tyra v. State,* 897 S.W.2d 796, 799 (Tex.Crim.App.1995); *see also Lozano v. State,* 860 S.W.2d 152, 156 (Tex.App.— Austin 1993, pet. ref'd).

Moreover, while Appellant's expert testified that the dosages used by Appellant on Garland were not lethal and that the drugs were not deadly weapons, the State adduced sufficient testimony from Dr. Peerwani that the mixture of drugs that Appellant gave Garland was capable of causing, and did cause, Garland's death. Dr. Peerwani also testified that Garland's blood contained more than twice the minimum lethal dose of Demerol, more than twice the minimum lethal dose of Versed, and that either dose alone could have been fatal.

Because a deadly weapon finding can be appropriate in an involuntary manslaughter case and because the evidence in this case is sufficient to support the deadly weapon finding, we overrule point of error 54.

## Double Jeopardy

■ In points of error 55 and 56, Appellant claims that the trial court erred in not granting his special plea of double jeopardy under the United States and Texas Constitutions. His double jeopardy claim is based on the State's revocation of his dentist's license and the settlement of a wrongful death suit brought by Garland's family. The State correctly notes that Appellant did not preserve error on his double jeopardy claim.

To preserve a complaint for appellate review, a party must have presented to the trial court a timely request or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. *See* Tex.R.App. P. 52(a). If a party fails to do this, error is not preserved, and the com-

plaint is waived. *See DeBlanc v. State,* 799 S.W.2d 701, 718 (Tex.Crim.App.1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991). A specific ruling on the request or motion must clearly appear in the record. *See* TEX.R.APP. P. 52(a); *Darty v. State,* 709 S.W.2d 652, 655 (Tex.Crim.App. 1986). If the trial court refuses to rule after a request, an objection to this refusal preserves the complaint for appeal. See TEX. R.APP. P. 52(a).

Generally, the procedure for raising a double jeopardy claim is the filing of a sworn special plea presenting the issue at the time of trial. *See* TEX.CODE CRIM. PROC. ANN. art. 27.05 (Vernon 1989); *Casey v. State,* 828 S.W.2d 214, 215 (Tex.App.—Amarillo 1992, no pet.). If the trial court determines that a defendant's special plea presents a legally sufficient claim, then the special plea must be submitted and tried to the jury together with the defendant's not-guilty plea. *See* TEX. CODE CRIM. PROC. ANN. art. 27.07 (Vernon 1989); *Apolinar v. State,* 820 S.W.2d 792, 794 (Tex.Crim.App.1991). A trial court can only submit the special plea to the jury; it cannot summarily grant relief on it. *See Apolinar,* 820 S.W.2d at 794.

While Appellant presented his special plea to the trial judge, who, while unable to "grant" the special plea, took it under advisement, Appellant never raised the issue again, nor did he request a special jury charge on double jeopardy or object to the exclusion of the special plea from the jury charge, as he was required to do. *See Vasquez v. State,* 919 S.W.2d 433, 435 (Tex.Crim.App.1996). By not obtaining a ruling from the trial court and by not requesting a jury charge on double jeopardy or objecting to the charge on that basis, Appellant has not preserved error on his double jeopardy claim. *See* TEX. R.APP. P. 52(a); *Vasquez,* 919 S.W.2d at 435. We overrule points of error 55 and 56.

### Conclusion

Having found no error in the trial court and overruled all 56 points of error, we affirm the trial court's judgment.