COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-08-179-CR

 

 

PEDRO ARIEL ZARATE LUCIO                                                          APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

              FROM
THE 297TH DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I.  Introduction

Two-year-old
D.P. died from injuries she sustained when gang members parked in front of her
house and fired into the bedroom where she was sleeping.  For his part in the shooting, Appellant Pedro
Ariel Zarate Lucio was convicted of murder and engaging in organized criminal
activity and sentenced to sixty years=
confinement. 








In
three points on appeal, Appellant claims that the trial court erred by allowing
the prosecutor to ask a witness to waive her attorney-client privilege, by
admitting evidence Appellant contends is irrelevant, and by commenting on the
weight of the evidence in a supplemental jury charge.  We will affirm.

II.  Factual and Procedural Background

Appellant
belonged to an Arlington street gang known as the Latin Kings. Sometime around
midnight on May 4, 2006, he arrived at a Dallas nightclub with Martin Lozoya,
Yesenia Velasquez, and Yesenia=s
cousin Angelica.  Appellant and Martin
stayed close to the front of the clubCwhere
the Latin Kings were known to congregateCwhile
Yesenia and Angelica continued toward the back.

There,
Yesenia confronted sisters Roxanne ARoxy@
Espinosa and Pamela Rocha.  The women got
into a heated argument and security at the club asked all of them to leave.

On
the way out, Yesenia worried that Roxy might try to damage her car, so she
asked Robert Armendariz and Edgar Rosas to retrieve it from the parking lot for
her.  As soon as Robert and Edgar left to
do so, Yesenia realized that neither one of them knew what her car looked like
or where it was parked, so she asked Appellant to go help. 








Pamela
saw Appellant as he made his way through the parking lot.  She approached him with Jesse Prado, a former
member of the Latin Knights, a rival gang. 
Jesse and Appellant had known each other since childhood and had never
liked each other.

Over
Jesse=s
shoulder, Pamela taunted Appellant about a prior conflict involving one of her
brothers and one of Appellant=s
brothers.  Appellant took offense and
flashed Latin Kings gang signs at Jesse. 
When Jesse tried to walk away, Appellant followed alongside him,
continuing to flash gang signs and Atalking
trash.@

From
across the parking lot, Edgar could tell that Appellant and Jesse were not
engaged in Aa
friendly conversation.@  Dallas Police patrolling the area noticed the
commotion and dispersed it.  Appellant
stalked off, declaring that he would Atake
care of it later.@

Robert
and Edgar found Yesenia=s Nissan Altima and drove it
to her.  She, Angelica, and Martin piled
into the back seat, as did Appellant when they caught up with him.

Appellant
was visibly angry.  He Amentioned
something about going to get an AK@ and
started making calls on his cell phone. 
Robert heard him call AMapa,@ a
nickname for Victor Aguilar, who is known for carrying guns.  He also heard him say into the phone, AI=m
going to shoot Jesse=s house up,@ and
A[G]et
ready.@  Edgar overheard Appellant say Asomething
about an AK,@ to Aget
ready,@ and
that Ait=s
gonna happen tonight.@








Angelica
rode on Appellant=s lap in the cramped
backseat.  They soon started
arguing.  Appellant then argued with
Yesenia, which resulted in his and Martin=s
departure from the vehicle at a 7B11
store in Grand Prairie.  With Appellant
and Martin out of the car, Robert called Jesse and warned him that Appellant
had said he was Agoing to go shoot Jesse=s
house up.@  Jesse, who was having a late dinner, headed
home.

Yesenia
had been on her cell phone complaining to her friend Ely Almendariz about her
run-in with Roxy and Pamela.  Ely was at
her cousin Victor AMapa@
Aguilar=s
house drinking with Victor and Henry AElmo@
Gabrillo, both Latin Kings.  Ely was
upset after hearing about the argument and wanted to go confront Roxy with
Yesenia when Appellant called, needing a ride. 
Ely was too intoxicated to drive, so Henry agreed to drive Ely=s
tan GMC Suburban.  Ely rode in the
passenger seat, and Victor and his date Alexis Ledesma rode in the
backseat.  Henry drove to Grand Prairie,
where they picked up Appellant and Martin walking along Pioneer Parkway.

After
a short drive, Henry stopped the Suburban again and got out.  Ely had been passing in and out of
consciousness, but she awoke when she heard gunfire and saw Henry running back
to the car.  He climbed in, set a .40
caliber Glock handgun on the console, and resumed driving.  Ely stashed the weapon in her purse on the
floorboard.








Jesse
had three young children with Christine Arredondo, and Christine was pregnant
with their fourth child.  D.P. was about
one-and-a-half-years old, little brother J.P. was almost one, and older sister
A.P was two.  The children were in bed in
the front bedroom of their house.  D.P.
and J.P. were sleeping closest to the window that faced the street, and A.P.
was sleeping near the wall on the opposite side of the bed. Christine had dozed
off next to A.P. while watching television.

That
night, the weather turned rough.  Severe
thunderstorms had rumbled into the Metroplex. 
Around three in the morning, Christine awoke to what she thought was the
sound of thunder or hail hitting the window. 
She saw J.P. sitting up in the bed screaming, and she noticed a hole in
his shirt.  She went to hold him and felt
blood on his hand.  Alarmed, Christine
looked out the window and noticed a tan Suburban parked in the street with
someone in the seat behind the driver reaching out to close the door.  Then Christine noticed that the bedroom=s
bottom window pane had been shattered.

She
carried her son into the living room to look at him under the light.  His shoulder had been nicked but he was
otherwise unharmed.  Christine hurried
back to the bedroom, turned the light on, and checked her other children. 

The
oldest was fine.  But D.P. lay underneath
a pillow at a different angle from how she had gone to sleep.  Christine lifted the pillow and saw a pool of
blood on the bed.  She screamed, grabbed
D.P., ran to the living room, scooped up J.P., and ran with them both across
the street for help.

It
was raining hard.  Christine was seven
months pregnant, and when she reached the grass at the curb while carrying her
two children, she slipped.








Julian
Garza lived across the street.  Awakened
by the sound of gunfire, he checked on his children and then looked
outside.  Seeing nothing unusual, he went
back into the house.  As he was closing
the door, however, he heard Christine screaming.  He looked outside again and saw her fall. 

Christine
had dropped her children.  Unable to
carry them both at the same time, she passed her son to Julian and then went
back for D.P. who lay on the concrete, barely breathing.  The neighbor handed J.P. to his wife and then
reached for D.P.  He carried her to the
living room and lay her down on the floor. 
She was bleeding badly.  Julian
tried to staunch the blood with a towel. 
One of his sons called 911. 
Another family member retrieved Christine=s
other daughter from across the street.

Arlington
Police Officer Anthony Wright responded to the 911 call.  When he arrived, he saw D.P. on the living
room floor with a severe head injury. 
Almost immediately, fire department personnel rushed in and transported
her to Fort Worth=s Cook Children=s
Hospital.

She
arrived in grave condition.  The left
side of her brain had been severely damaged by a gunshot wound.  The bullet was still there, resting in front
of her ear.  In an attempt to save her
life, surgeons removed half of D.P.=s
brain.  Her prognosis was Aterrible.@  She survived another six months before dying
from the injuries caused by the gunshot. 








Christine
described the Suburban she had seen outside the window to Officer Wright, who
immediately broadcast the description to all units in the area.  After Jesse arrived and learned that his
children had been shot, he reported the earlier altercation and Appellant=s
threat to shoot up his house.

Officer
Heather Boone spotted a tan Suburban that matched the broadcast
description.  Henry, Ely, and Appellant
were still inside the vehicleCthe
others having been dropped off after the shooting.  Henry led officers on a brief chase and then
pulled over.  One by one, he, Ely, and
Appellant were ordered out of the Suburban and taken into custody.

Officers
found the Glock in Ely=s purse under the front
seat.  Ely, Henry, and Appellant all
tested positive for gunpowder residue. 
The results of Appellant=s
test showed that he either had been close to the weapon when it was fired or
had handled it afterward.  Subsequent
analysis of the weapon linked it to expelled cartridge casings found in the
street in front of the Prado home. 
Bullets recovered from the home and the one recovered from D.P. during
surgery shared Aconsistent characteristics@ but
were not established to a scientific certainty to have all been fired from the
weapon found in Ely=s purse. 

Henry
and Appellant denied any involvement in the shooting.  Police interviewed Ely twice on the morning
of her arrest, and both times she claimed to have been the sole shooter.  Her story, however, did not make sense to
investigators:  she claimed that she had
shot at the house because she had become enraged after Yesenia called her and
told her about the argument with Roxy.








Ely
eventually recanted her confession, and after repeated meetings with
investigators and prosecutors, she was released from custody and all charges
against her were dropped.  She testified
at a hearing some months before Appellant=s
trial and then again at his trial.

The
trial ran more than two weeks.  In the
end, the jury acquitted Appellant of the capital murder charge but convicted
him of murder and engaging in organized criminal activity.  The jury assessed his punishment at sixty
years=
confinement for each conviction.  The
trial court sentenced him accordingly, ordering that the sentences run
concurrently.

III.  Improper Question

In
his first point, Appellant claims that the trial court abused its discretion by
allowing the prosecutor to ask Ely to waive her attorney-client privilege.

Ely
obtained counsel following her arrest on the morning of the shooting.  After some time in jail following her initial
confession, she recanted and was Aready
to tell the truth.@  On September 21, 2007, she and her lawyer met
with the prosecutor to discuss her testimony for a hearing scheduled four days
later.  On September 25, 2007, Ely
testified under oath that Appellant, Henry Gabrillo, and Victor Aguilar were
all members of the Latin Kings gang, that the gun used in the shooting belonged
to Victor, that he had suggested disposing of it and had instructed her to call
a woman he knew who would help her do so, and that Ely Ahad
a memory@ of
the passenger door of the Suburban closing immediately after the shooting. 








Jury
selection for Appellant=s trial was set for May 6,
2008.  Approximately ten days before
trial, Ely met with the prosecution at a McDonald=s
restaurant to once again review her upcoming testimony.  On May 8, 2008, Ely was the ninth of eighteen
witnesses called by the State in its case in chief.  She admitted on the stand that she had been
present during the shooting, had concealed the murder weapon in her purse, and
had twice falsely confessed to police to having been the shooter before charges
against her were dropped.

Ely
acknowledged that she had met with the prosecution numerous times to discuss
her testimony, including the meeting at McDonald=s
some ten days or so before trial.  During
questioning by the State, however, she professed not to remember many of the
facts she had previously either discussed with the prosecution or testified
to.  Moreover, although she admitted that
she knew Appellant, Victor Aguilar, Martin Lozoya, and Henry Gabrillo, she
claimed to have lied when she testified at the September hearing that they were
all members of the Latin Kings. 

The
trial recessed for lunch between Ely=s
direct examination by the State and cross examination by the defense.  During the break, Ely visited with Appellant=s
counsel.  Afterwards, she testified on
cross-examination that she had repeatedly lied to prosecutors, claiming that
she had told them Awhat they wanted to hear@
because she was Atired of being in jail,@
would have said anything to get out, and was afraid that if she changed her
story the prosecutor would make it Abad@ for
her. 








On
the State=s
redirect, Ely was asked about statements she had made to the prosecution during
their meeting at the McDonald=s
before trial.  She denied saying that she
knew before the shooting that Appellant and Victor did not like Jesse.  She did not remember saying that Appellant
was angry when he got in the Suburban or that he had talked about Athe
fight at the club with Jesse.@  At first she did not remember telling the
prosecution that the gun belonged to Victor but then testified that she had Asaid
it for a reason.@

At
that point, the prosecutor began the following line of questions that forms the
basis of Appellant=s first point on appeal:

Q.  Are
you willing to waive your attorney/client privilege and allow [your attorney]
Mr. Brown to talk to this jury about the things you told him about that on that
night?

 

[DEFENSE
COUNSEL]: I=m
going to object without her counsel present to explain what he means legally on
that matter.

THE
COURT: I will overrule the objection.

Q. [PROSECUTOR:] You have a right to prevent
him from testifying and telling these people what you said, okay?  It=s secret. 
It=s secret.  Unless you give permission for him to talk to
these people, he can=t do it.

 

Are
you willing to right now on the record give him permission to talk to these
people and tell them what you told him about that night?

A.  What do you mean?

Q.  I=m
sorry?

A.  What?








Q.  Are you willing right now to give your
attorney, Scott Brown, permission to tell these people what you told him about
the things that happened that night?

A.  No.

Q.  You don=t
want him saying what you told him, right?

[DEFENSE
COUNSEL]:  I=m
going to object again.  This is
attorney/client privilege that he is inquiring about.

THE
COURT:  Overruled.

[DEFENSE
COUNSEL]:  And I ask for a running
objection to all questions related to this matter.

THE
COURT:  All right.

[DEFENSE
COUNSEL]:  Thank you.  Also, Your Honor, I=m
asking for a mistrial based on this.

THE
COURT:  Denied.

Appellant
contends that the prosecutor=s
soliciting Ely=s
waiver of her attorney-client privilege violates Texas Rule of Evidence 513,
which prohibits comments on a claim of privilege before the jury.  Specifically, Appellant points to parts (a)
and (b) of the rule, which state in pertinent part:

(a) Comment of Inference Not Permitted. . . .
the claim of a privilege . . . is not a proper subject of comment by judge or
counsel, and no inference may be drawn therefrom.

 

(b)
Claiming Privilege Without Knowledge of Jury. 
In jury cases, proceedings shall be conducted, to the extent
practicable, so as to facilitate the making of claims of privilege without the
knowledge of the jury.








Tex. R. Evid. 513.  The State argues that Appellant=s
claim is not preserved for our review.[2]


An
appellant=s
complaint on appeal must comport with the specific objection made at
trial.  See Pena v. State,
285 S.W.3d 459, 464 (Tex. Crim. App. 2009); Simmons v. State, 288 S.W.3d
72, 77 (Tex. App.CHouston [1st Dist.] 2009,
pet. ref=d).  An objection stating one legal theory may not
be used to support a different legal theory on appeal.  Broxton, 909 S.W.2d at 918; Johnson
v. State, 803 S.W.2d 272, 292 (Tex. Crim. App. 1990), cert. denied,
501 U.S. 1259 (1991), overruled on other grounds by Heitman v. State,
815 S.W.2d 681 (Tex. Crim. App. 1991); Simmons, 288 S.W.3d at 77.








Appellant=s
first objection to the prosecutor=s
question does not comport with his theory on appeal.  At trial, he objected that Ely should not
have been asked whether she would be willing to waive her attorney-client privilege
Awithout
her counsel present to explain what he means legally on that matter.@  On appeal, though, he complains that the
trial court=s
having allowed the question violated rule 513= s
proscription against comment before the jury on a claim of privilege, in this
instance Ely=s
attorney-client privilege.  The two issues
are separate and one has little if anything to do with the other.  The presence of Ely=s
counsel to explain what the prosecutor means by asking Ely to waive her
attorney-client privilege is unrelated to whether asking her in the jury=s
presence violated rule 513.

A
proper objection, one that would comport with this point on appeal, would have
alerted the trial court to the fact that the prosecutor was talking about Ely=s
attorney-client privilege in front of the jury. 
Indeed, trial counsel later asserted an objection that does comport with
his point on appeal when she objected that A[t]his
is attorney/client privilege that he is inquiring about.@

But
because Appellant=s first objection does not
comport with the complaint on appeal, existing case law requires us to hold
that the objection did not preserve Appellant=s
complaint that the trial court violated rule 513 by allowing the prosecutor to
ask Ely if she would waive her attorney-client privilege.  See Broxton, 909 S.W.2d at 918;
Johnson, 803 S.W.2d at 292; Simmons, 288 S.W.3d at 77.

Although
we have noted that Appellant=s
second objection comports with his point on appeal, by the time counsel
articulated it at trial, it was too late to preserve Appellant=s
complaint.  It is well-settled that a
timely objection is required in order to preserve a complaint for review.  See Tex. R. App. P. 33.1(a)(1)(A); Layton
v. State, 280 S.W.3d 235, 238B39
(Tex. Crim. App. 2009).  A timely
objection is one that is made at the first opportunity or as soon as the basis
for it becomes apparent.  Lagrone v.
State, 942 S.W.2d 602, 618 (Tex. Crim. App.), cert. denied, 522 U.S.
917 (1997); Polk v. State, 729 S.W.2d 749, 753 (Tex. Crim. App. 1987).








After the trial court overruled Appellant=s first objection to
the prosecutor=s request for Ely to
waive her privilege, the prosecutor explained to Ely that she had a Aright to prevent
[counsel] from testifying and telling these people [the jury] what you said.@  He then repeated the question:  AAre you willing to right now on the record
give him permission to talk to these people and tell them what you told him
about that night?@  Although this question was objectionable,
Appellant stood mute, did not object, and Ely responded to the prosecutor=s question by asking,
AWhat do you mean?@  The prosecutor replied with AI=m sorry?@ to which Ely
replied, AWhat?@  The record then shows that the prosecutor
repeated the question a third time and that Ely answered it.

 

Q.  Are you willing right now to give your
attorney, Scott Brown, permission to tell these people what you told him about
the things that happened that night?

A.  No.

Finally,
after the prosecutor confirmed Ely=s
answer, Appellant objected.

Q.  You don=t
want him saying what you told him, right?

[DEFENSE
COUNSEL]: I=m
going to object again.  This is
attorney/client privilege that he is inquiring about.

THE
COURT: Overruled.








By
then, however, it was too late to preserve the claim for our review. Appellant=s
objection was untimely as contemplated by our rules of error preservation
because it was not presented until after the prosecutor asked numerous times
whether Ely would waive her privilege and even explained the privilege to her.  See Tex. R. App. P. 33.1(a)(1)(A); Lagrone,
942 S.W.2d at 618; Dinkins v. State, 894 S.W.2d 330, 355 (Tex. Crim.
App. 1995); Johnson, 803 S.W.2d at 291; Marini v. State, 593
S.W.2d 709, 714 (Tex. Crim. App. 1980). 
We hold, therefore, that Appellant=s
second objection failed to preserve his complaint for our review.

Because
neither of Appellant=s objections preserved his
claim for our review, we overrule Appellant=s
first point.

IV.  Prior Shooting Incident

In
his second point, Appellant contends that the trial court abused its discretion
by admitting evidence that Appellant had previously been the victim of a
shooting. 

Arlington
Police Department Gang Unit Officer Sean Wheetley testified that, in his
opinion, Appellant was a member of the Latin Kings gang.  Officer Wheetley also testified that in 2003
he had investigated a shooting in which Appellant was the victim and about
which Latin Kings gang members Henry Gabrillo and Appellant=s
older brother Ishmael Lucio believed Amight
possibly@
have been gang-related.  The officer
further testified, however, that the investigation had ultimately produced no
clear answer on whether that shooting was gang-related or whether it even
occurred as originally reported and that he had concluded the investigation
without filing charges.













Appellant
argues that because Officer Wheetley could not determine if the prior shooting
had been gang-related, his testimony regarding the investigation was not
relevant to the issue of whether the shooting in the instant case was
gang-related.  But whether or not the
officer could determine if the earlier shooting had been gang-related, evidence
that Appellant was reportedly shot under suspicious circumstances and that
known gang membersCincluding Henry GabrilloChad
believed that the earlier shooting could have been gang related is relevant to
the issue of whether the shooting hereCinvolving
Appellant and HenryCis gang-related.  Although evidence of the earlier shooting
does not establish conclusively that the shooting in the instant case was
gang-related, it nonetheless provides a Asmall
nudge@
toward proving that it was.  Montgomery
v. State, 810 S.W.2d 372, 376 (Tex. Crim. App. 1990) (op. on reh=g);
Levario v. State, 964 S.W.2d 290, 297 (Tex. App.CEl
Paso 1997, no pet.); see Hawkins v. State, 871 S.W.2d 539, 541B42
(Tex. App.CFort
Worth 1994, no pet.); see also Tex. R. Evid. 401 (defining A[r]elevant
evidence@ as
evidence having any tendency to make the existence of any fact of
consequence more probable or less probable). 
That is all that is required.  See
Montgomery, 810 S.W.2d at 376; 1 Steven Goode, et. al., Texas
Practice:  Guide to the Texas Rules of
Evidence '
401.3 (3d ed. 2002)(AIf evidence alters the
probabilities involved in any degree, it is relevant.@).   We hold, therefore, that the trial court
acted within its wide discretion by admitting Officer Wheetley=s
testimony about the prior shooting, and we overrule Appellant=s
second point.  See Carrasco v. State,
154 S.W.3d 127, 129 (Tex. Crim. App. 2005); Montgomery, 810 S.W.2d at
379.

V.  Response to Jury Note During Punishment
Deliberations

In
his third and final point, Appellant asserts that the trial court erred by
administering an unnecessary supplemental jury instruction at punishment that
amounted to a comment on the weight of the evidence. 

During
its deliberations on punishment, the jury sent out the following note:

Does the law prevent a
family member from speaking during the sentencing phase for the defendant?

Over
Appellant=s
objection, the trial court responded with the following instruction:

The law does not prohibit a
family member from testifying on behalf of a defendant so long as the witness
has relevant evidence related to the issues in the case.  You have heard all of the witnesses who have
been called to testify.  Please continue
your deliberations.








It
is well settled that although a jury is the exclusive judge of the facts, it is
bound to receive the law from the court and to be governed by such law.  Abnor v. State, 871 S.W.2d 726, 731
(Tex. Crim. App. 1994); Chance v. State, 292 S.W.3d 138, 141
(Tex. App.CHouston
[14th Dist.] 2008, pet. ref=d); see
Tex. Code Crim Proc. Ann. art 36.13 (Vernon 2007).  In giving its charge and in responding to
questions from the jury, the trial court may not comment on the weight of the
evidence.  Whaley v. State, 717
S.W.2d 26, 32 (Tex. Crim. App. 1986); Grady v. State, 634 S.W.2d 316,
317 (Tex. Crim. App. 1982); Davis v. State, 955 S.W.2d 340, 351
(Tex. App.CFort
Worth 1997, pet. ref=d); see Tex. Code
Crim. Proc. Ann. art. 36.14 (Vernon 2007). 
But a trial court may respond to a jury note with a legally correct
statement of the law.  See, e.g., Krause
v. State, 243 S.W.3d 95, 108 (Tex. App.CHouston
[1st Dist.] 2007, pet. ref=d); Ryan
v. State, No. 06-07-00081-CR, 2007 WL 4118296, at *2 (Tex. App.CTexarkana
Nov. 21, 2007, pet. ref=d) (mem. op., not designated
for publication) (holding that a trial court=s
accurate statement of law in response to a jury question was not grounds for
reversal). 

Here,
we hold that the trial court=s
response to the jury note was a correct statement of the law.  Compare Chance v. State, 292 S.W.3d
138, 141B42
(Tex. App.CHouston
[14 Dist.] 2008, pet. ref=d) (holding trial court=s
response to jury=s question properly
clarified question of law); Kuhn v. State, No. 2‑07‑00157‑CR,
2008 WL 344516, at *4 (Tex. App.CFort
Worth Feb. 7, 2008, no pet.) (mem. op., not designated for publication) (same),
with Matamoros v. State, 901 S.W.2d 470, 477 (Tex. Crim. App. 1995)
(holding instruction about reliability of DNA evidence is impermissible comment
on weight of evidence); Daniell v. State, 848 S.W.2d 145, 147 (Tex.
Crim. App. 1993) (holding instruction about available correction facilities for
defendant was erroneous instruction about a factual, rather than legal,
matter).  The trial court=s
response expressed no opinion as to the weight of the evidence, nor did it
assume the existence of a disputed fact. 
See Whaley, 717 S.W.2d at 32; Davis v. State, 955 S.W.2d
340, 351 (Tex. App.CFort Worth 1997, pet. ref=d). 








Because
the trial court did not err in its response to the jury=s
note, we overrule Appellant=s
third point.

 

VI.  Conclusion

Having
overruled all of Appellant=s
points, we affirm the judgment.

 

PER CURIAM

 

PANEL: WALKER,J.;
LIVINGSTON, C.J.; and MEIER, J.

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED: April 29, 2010











[1]See Tex. R. App. P. 47.4.





[2]The State does not
argue that the prosecutor did not violate rule 513, and in fact, the prosecutor=s questioning clearly
violated that rule.  However, we need not
reach the merits of Appellant=s argument if he did
not properly preserve the complaint for our review.  See Broxton v. State, 909 S.W.2d 912,
918 (Tex. Crim. App. 1995) (noting that a reviewing court will not consider
errors, even of constitutional magnitude, not properly preserved).