**Bradley Keith JUDD, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–94–416–CR.**

Court of Appeals of Texas,
Fort Worth.

May 9, 1996.

Rehearing Overruled June 20, 1996.

**136**

Tim Curry, Criminal District Attorney; Betty Marshall and Charles M. Mallin, Assistant Chiefs of Appellate Section; David M. Curl, Lisa Mullen, Lance Evans, Assistant Criminal District Attorneys, Fort Worth, for Appellee.

Before CAYCE, C.J., and DAY and HOLMAN, JJ.

## OPINION

HOLMAN, Justice.

In two counts, the indictment alleges that Bradley Keith Judd murdered his wife, Mel-issa, by choking her with his hand. *See* TEX.PENAL CODE ANN. § 19.02(b)(1), (2) (Vernon 1994). The jury found Judd guilty and sentenced him to life imprisonment. On appeal, Bradley contends that his constitutional right to confront witnesses was denied and that the court should not have asked the jury to find whether he had used a deadly weapon in the murder because he did not have adequate notice that the issue would be submitted.

We affirm.

Melissa's body was never found. Her co-worker, Debbie Harkness, testified that on November 14, 1991, she was scheduled to drive Melissa to the company where both worked. When she stopped at Melissa's house, she went inside and found Melissa "frantic," crying, and talking with Bradley by telephone. Melissa was living at the house with Anthony Hargrove, and Bradley lived elsewhere. Although Debbie was not a party to the telephone conversation, she was close enough to Melissa's telephone receiver that she heard and recognized Bradley's voice and believed that he was arguing with Melissa about the possibility of divorce. When the telephone conversation ended, Debbie drove Melissa to the company where they were employed. Their work-shift lasted until the early hours before dawn on Friday, November 15, 1991. After work, Debbie drove Melissa home and watched as she entered. Debbie testified that Melissa planned to give Bradley "the divorce papers" during daylight hours, then join Debbie for a Friday evening dinner.

Debbie went back to Melissa's house around 4:00 p.m. Friday afternoon and found no one home. Debbie left for awhile, then returned, but still found no one at Melissa's house. Debbie then went to the tavern where they had planned to spend the evening, but Melissa was not there. Melissa did not appear for work on Monday, and Debbie never saw or heard from her after taking her home on Friday, November 15, 1991.

Anthony Hargrove testified that he and Melissa had planned to go out with Debbie on that Friday evening, but Melissa left the house about noon and he never saw her

again. Anthony said she left on foot, with "[j]ust the clothes on her back," after telling him that she was going to walk to a nearby store and see her children. Anthony testified that in the previous three years, he had worked in both Texas and Oklahoma, alternating his residence between those states "about four times" during that period. After Melissa had been missing for a week, Anthony moved back to Oklahoma.

Kathryn Johnsrud is Melissa's mother. She testified that she knew of violence between Melissa and Bradley and had seen bruises (fist and fingerprints) on Melissa's arm and throat. She told jurors that after Melissa disappeared, she went to Melissa's house and found that she had left without taking her personal belongings, clothing, her children's records, or a $350 food stamp check. Kathryn's unsuccessful efforts to locate Melissa included using posters and newspaper ads, and making inquiries at the social security office, police departments, hospitals, and the medical examiner's office.

Kathryn testified that Bradley originally told her he did not know where Melissa was. In December 1991, Kathryn went to Bradley's mobile home where she noticed a trash can in which something had recently been burned. On that visit, Bradley told Kathryn he had not heard from Melissa. Another day, Kathryn telephoned Bradley to ask whether he had any new information, and he said Melissa had left a note on his door telling him she had brought Kathryn's television set there so Kathryn could pick it up. Kathryn told the jury that, on a different day, "[h]e had changed his story from the first time of not seeing her to saying that he had picked her up and they went back to the trailer. They'd talked. They had got in an argument. He took her and dropped her off at a bar."

Eventually, Bradley obtained a default divorce from Melissa and married April Dawn (Judd). Kathryn suspected Bradley of harming Melissa and, in June 1993, went to him. She told the jury:

I went and visited with him. He was surprised to see me, but he said it was nice, asked me what was I there for. I told him I wanted to talk to him. I wanted

to know where Melissa was. I wanted to put her body to rest so the kids and I and our families could move forward.

And he said he wasn't sure if he should say anything to me. I told him, "You owe me that much after everything I've done to help you out, too." So we talked. He cried and he shook and he cried, said he was sorry, he didn't mean to hurt her, that he had loved her.

I asked him to describe to me what he had done. And he told me that he had been drinking. He'd left his grandmother's. He had went and picked up some beer and he had been very depressed. And that he was—he had been drinking. He ended up back at his trailer and he finished off a beer and he went to get more beer.

He said when he came back, Melissa was on the porch waiting there for him. He said that they were talking and started out just talking. Then they ended up in an argument. Then he told her to get the—

. . . .

. . . hell out. He went to push her. When he pushed her, she hit him back. And he said she hit him back with a skillet. And then he says he turned around and he grabbed her by the throat and shook her and shook her until he blacked out. He blacked out. He said he doesn't know what happened after that.

The prosecutor asked whether Bradley had disclosed where Melissa's body was, and Kathryn testified, "No. He said he couldn't remember."

April told the jury that she and Bradley argued during their marriage. April said that on two occasions, she told Bradley she would call the police if he left her, and Bradley responded by saying that if April ever got him in trouble with the police, "he would take them to where the bitch's body was." April testified that Bradley used the term "bitch" to refer to Melissa. She told jurors that another time, Bradley warned her that he would show the police where *Melissa's* body was and that he appeared upset about a photograph of his mobile home that depicted a "burning barrel" outside the home. Brad-

ley told April "that picture could get him in trouble if he ever got caught for [Melissa's] disappearance . . . [because] [h]e had burned some [of Melissa's] clothes and a TV . . . in this barrel."

J. Glenn Diviney is a criminal investigator for the Tarrant County sheriff's office who interviewed Bradley and took his statement. Investigator Diviney read to the jury the statement (State's Ex. 1) that Bradley had dictated and Diviney had transcribed. A portion of the statement says,

> We started to argue . . .
>
> . . . I turned and grabbed her by the throat and told her she wouldn't hurt me anymore, and I blacked out.
>
> . . . I'm not for certain, but I think I choked Melissa to death. . . .
>
> . . . .
>
> I feel like after I passed out, I dumped Melissa's body somewhere. I showed you the area today.

Bradley signed the statement on each of its pages.

Diviney testified that before dictating the statement, Bradley had taken him to a specific manhole in a street, "[b]ecause he told us that a psychic had told him that Melissa's body was in that sewer." Diviney told the jury that Bradley would not go near the manhole or look inside.

Diviney testified about what he had learned from the Fort Worth Water Department about the workings and flowage of the sewer line under the manhole. When the prosecutor asked what results Diviney had expected from the search of the drying pad at the end of the sewer line, Diviney replied that he was not optimistic after talking to the Fort Worth Water Department. Bradley's trial attorney objected on grounds of hearsay. After discussion with the attorneys, the court overruled the hearsay objection and instructed the jury that "the testimony being elicited in response to this question is not offered for the truth of the matter asserted, but rather to assist you, if it does, in determining the state of mind of [Diviney] at the time in question." *See* TEX.R.CRIM.EVID. 105(a).

With no further objection by Bradley's attorney, Diviney continued: "[t]he sewer supervisor told me that line would completely decompose a full grown horse if it had been blown through that line and we would recover only fragments." Diviney also testified that they did not recover the body or any body part of Melissa.

Bradley argues, under points of error one and two, that because the trial court overruled the hearsay objection, he was erroneously deprived of the ability to cross-examine the water department employee about the process of decomposition inside the sewer line, which denied his rights to due process and to confront the witnesses against him, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 10 of the Texas Constitution.

Bradley contends that the State wanted to explain the inability to produce Melissa's body with testimony showing that if he had killed Melissa and dumped her body in the manhole to which he directed the police, the body would have been completely disintegrated by the high-pressure intensity of the sewer line flow. Bradley submits that this explanation for not finding a body depended solely on the inadmissible hearsay testimony of the water department employee.

The State responds that Bradley's objection at trial does not comport with his points of error so that his constitutional complaints are not preserved for appeal. Generally, error must be preserved at trial by a timely and specific objection, and any objection at trial that differs from the complaint on appeal preserves nothing for review. *Sterling v. State,* 800 S.W.2d 513, 521 (Tex. Crim.App.1990), *cert. denied,* 501 U.S. 1213, 111 S.Ct. 2816, 115 L.Ed.2d 988 (1991).

We accept Bradley's thesis that the right of cross-examination is the primary interest secured by the right of confrontation granted by the Sixth Amendment to the United States Constitution and that the Fourteenth Amendment embraces the right of confrontation within its entitlement of due process. *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13

L.Ed.2d 934 (1965); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). It also may be properly arguable that article I, section 10 of the Texas Constitution affords an even greater right of confrontation than does the Sixth Amendment to the United States Constitution. *See Gonzales v. State,* 818 S.W.2d 756, 762–63 (Tex. Crim.App.1991).

However, Bradley objected at trial on the ground of hearsay, not on the ground that he had been denied his right to confront a witness. Those two grounds are neither synonymous nor necessarily coextensive. *Holland v. State,* 802 S.W.2d 696, 700 (Tex.Crim.App. 1991). The record is plain that Bradley did not complain in the trial court that the admission of hearsay violated his right of confrontation under either the United States or Texas constitutions. We hold that Bradley did not preserve for appeal the portions of points of error one and two that complain of the denial of his United States and state constitutional rights to confront witnesses.

We also perceive both point one and point two as multifarious because the first sentence of each point, read alone, presents nothing more than a hearsay complaint, which was the specific ground of Bradley's objection in the trial court. It is only the second sentence of each point that seeks to add an unpreserved constitutional dimension to Bradley's hearsay objection.

■ However, a point of error is sufficient if it directs the attention of the appellate court to the error about which complaint is made, and a single point may combine complaints made as to several issues relating to one ground of recovery or defense. *See* TEX. R.APP.P. 74(d). Although Bradley failed to preserve his constitutionally-based complaints for appeal, we accept the first sentences of points of error one and two as statements of adequately-preserved challenges on grounds of hearsay to the admissibility of Investigator Diviney's testimony that repeated for jurors the sewer line supervisor's out-of-court comment.

■ In court, Investigator Diviney credited the supervisor with having told him, out-of-court, that the line's pressure would "com-

pletely decompose a full grown horse if it had been blown through that line," and the trial court's limiting instruction was given upon the State's assurance that the testimony was not offered for its truth, but only to illustrate Investigator Diviney's state of mind while the sewer line was being searched for Melissa's body. *See* TEX.R.CRIM.EVID. 105(a).

We agree with Bradley's argument that Investigator Diviney's state of mind during the search was wholly immaterial to any issue in the case and that the out-of-court statement's only real value was to serve as the State's explanation of why no body could be found in the sewer line where the body supposedly was left. Investigator Diviney was not presented as an expert about the sewer line's pressure or decomposition of the line's contents. Bradley contends that to probe the chances for or against complete decomposition of a human body within the sewer line, he would have needed to cross-examine the out-of-court declarant, not Investigator Diviney. We agree and hold that the sewer line supervisor's remark was inadmissible hearsay that was not salvaged by the limiting instruction and that allowing the remark in evidence deprived Bradley of the right to cross-examine the out-of-court declarant about a critical statement, *i.e.,* the probabilities that no remnants of a body could exist in the line by the time it was searched.

On the complaint stated by Bradley in the first sentence of point of error one and the first sentence of point of error two, we hold that the trial court erred by overruling Bradley's hearsay objection.

■ Having found error, we must determine whether the improper admission of hearsay evidence was harmless beyond a reasonable doubt. TEX.R.APP.P. 81(b)(2); *Jones v. State,* 833 S.W.2d 118, 126 (Tex.Crim.App. 1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993). The determinant is not whether sufficient evidence to convict existed without the inadmissible hearsay, but whether there is a reasonable possibility that the erroneously admitted evidence contributed to the jury's verdict. *Id.* at 127. The error is harmful if a reasonable possibility exists that it moved the jury from a state

of nonpersuasion to one of persuasion beyond a reasonable doubt. *Id.*

After carefully reviewing the testimony of Kathryn and April and the statement made by Bradley (State's Ex. 1), all of which the jury heard before the hearsay was erroneously admitted, we find that there is no reasonable possibility that the challenged hearsay, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion beyond a reasonable doubt. We hold that the admission of the out-of-court comment attributed to the sewer line supervisor was harmless beyond a reasonable doubt.

Accordingly, points of error one and two are overruled in their entirety.

■ The third point of error is that the trial court erred by submitting to the jury a deadly weapon question because Bradley had inadequate notice that the issue would be presented.

> The indictment alleged that
>
> on or about the 15TH day of NOVEMBER 1991, [Bradley Keith Judd] did THEN AND THERE INTENTIONALLY AND KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, MELISSA JUDD, BY CHOKING HER WITH HIS HAND,
>
> PARAGRAPH TWO: AND IT IS FURTHER PRESENTED IN AND TO SAID COURT THAT THE SAID DEFENDANT IN THE COUNTY OF TARRANT AND STATE AFORESAID ON OR ABOUT THE 15TH DAY OF NOVEMBER, 1991, DID THEN AND THERE INTENTIONALLY WITH THE INTENT TO CAUSE SERIOUS BODILY INJURY TO MELISSA JUDD, COMMIT AN ACT CLEARLY DANGEROUS TO HUMAN LIFE, NAMELY, CHOKING HER WITH HIS HAND, WHICH CAUSED THE DEATH OF MELISSA JUDD.

■ Although a hand is not a deadly weapon per se, it may become a deadly weapon if evidence in the case shows that, in the manner of its use, the hand was capable of causing death or serious bodily injury. *Turner v. State*, 664 S.W.2d 86, 90 (Tex.Crim. App. [Panel Op.] 1983); *Brooks v. State*, 900

S.W.2d 468, 472 (Tex.App.—Texarkana 1995, no pet.).

■ An accused is entitled to notice in some form that the State intends to pursue an affirmative finding on whether a deadly weapon was used in the commission of a charged offense. *Grettenberg v. State*, 790 S.W.2d 613, 614 (Tex.Crim.App.1990). Any allegation which avers an attempt to cause the death of a person by the use of a named weapon necessarily includes an allegation that the named weapon or instrument was, in the manner of its use or intended use, capable of causing death. *Id.*

Bradley's trial began on a Monday. On the previous Thursday, the State pled, filed and mailed to Bradley's trial attorney a written notice of intent to seek a deadly weapon finding against Bradley. Bradley's attorney received the notice on Sunday night before the Monday morning trial. Bradley complains that notice of less than twenty-four hours is insufficient as a matter of law but has found no cases directly on point.

The State responds with three arguments: (1) that the November 29, 1993 indictment allegations were sufficient to put Bradley on notice of the State's intent to seek a deadly weapon finding, months before the August 22, 1994 trial; and (2) receiving another notice on the day before trial was sufficient; and (3) Bradley waived any complaint about inadequate notice by not asking the court for more time to prepare his defense.

Because we agree with the State's first argument, we need not address its second or third argument. Although Bradley's indictment does not use the words "deadly weapon," it alleges that Melissa's death was caused by Bradley choking her with his hand. That necessarily means that Bradley's hand, in the manner of its use on Melissa, was capable of causing death or serious bodily injury, *i.e.*, that the hand was a "deadly weapon." *See Johnson v. State*, 815 S.W.2d 707, 709 (Tex.Crim.App.1991). Therefore, we hold that the indictment clearly gave Bradley the necessary notice that use of a deadly weapon would be an issue in his prosecution and that the State would seek an affirmative finding on his use of a deadly weapon. *Id.;*

see also *Ex parte McKithan*, 838 S.W.2d 560, 561 (Tex.Crim.App.1992).

The Court's charge on punishment defined "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *See* TEX.PENAL CODE ANN. § 1.07(a)(17)(B) (Vernon 1994). The court overruled Bradley's objections to the charge's definition of deadly weapon and to the jury question based on that definition, and the jury found that beyond a reasonable doubt Bradley used or exhibited a deadly weapon during the commission of the offense of murder.

Point of error number three is overruled, and the judgment of the trial court is affirmed.