TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00049-CR







Devlin Jefferson, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT


NO. 96-331-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING







 Appellant Devlin Jefferson appeals from his conviction for aggravated assault on a public
servant. See Tex. Penal Code Ann. § 22.02(a)(2), (b)(2) (West 1994). The jury found that appellant used
his hands as a deadly weapon in the commission of the offense and assessed appellant's punishment,
enhanced by prior felony convictions, at imprisonment for 35 years. The trial court made an affirmative
finding that appellant used a deadly weapon during the commission of the offense and ordered that
appellant's sentence commence upon the completion of appellant's previous felony sentence. Appellant
asserts that the trial court erred in admitting his videotaped incriminating statements and that the evidence
is factually insufficient to support his conviction. We will overrule appellant's points of error and affirm the
trial court's judgment.

 Appellant was an inmate at the Bartlett State Jail Facility. At breakfast one day, he took
two trays of food. This was a violation of facility rules. One of the dining hall guards, Diane Howell,
discovered the infraction and requested appellant's identification card. Appellant ignored Howell and kept
eating. Another guard, Jerry Gray, called for assistance. In response, the shift supervisor and complainant
Richard Demorest came to the dining hall. He ordered appellant to discard the two trays of food and leave
the dining hall. When appellant failed to comply, Demorest took the trays from appellant and discarded
them himself. Demorest returned to appellant and again ordered him from the hall. Appellant continued
to eat bacon and drink juice that he had taken off the trays. He slowly walked to the disposal window,
where Demorest ordered him to discard the drinking cup. Appellant kept drinking. Demorest ordered
appellant to submit to handcuffs, and pulled the cuffs from their pouch. Appellant discarded the cup and
began to walk away. Demorest attempted to block appellant's path with his arm; appellant pushed
through. Demorest again blocked appellant's path. Appellant pushed into Demorest's arm, turned, and
quickly struck Demorest three times in the face with his fist. Inmate Bobby Preston, a defense witness,
testified that Demorest began the fight by striking appellant on the head with his handcuffs.

 A struggle ensued between the two men. Officers Gray and Caldwell intervened and
subdued appellant. They took appellant to the infirmary to treat the cuts he had received on his face and
head. Demorest was taken to a hospital emergency room for treatment of a broken nose and cuts on his
face. At the infirmary, Gray videotaped appellant with a hand-held camera while Caldwell guarded the
door. Over appellant's objection, approximately 23 minutes of the tape was admitted in evidence. Gray
held the camera close to appellant and focused mainly on appellant's face. When appellant left his seat for
part of his treatment, Gray followed him with the camera. Gray testified that the purpose of the tape was
to record appellant's condition and treatment so that he could not later exaggerate the extent of his injuries. 
When the tape was admitted, the prosecutor played it for the jury while Gray provided a commentary. For
the first few minutes, appellant says nothing while the camera focuses on his face. Then he speaks to
Caldwell, asking him where he learned to tackle and whether he had played football. Then, speaking to
the camera, appellant states that now he will have to do his full five years, but he was "expecting it
anyways." For the next five minutes of the tape, appellant is treated by Patsy Herrmann, a facility nurse. 
He speaks with Herrmann and looks into the camera at least once during this period.

 As the nurse prepares to leave the room temporarily, appellant looks into the camera and
asks Gray whether the camera has been recording "the whole time." Gray responds, "Uh huh." Appellant
asks again, "Was it or wasn't it?" After receiving no response, appellant states, ". . .[H]e [Demorest]
shouldn't have put his hands on me. I wouldn't have done nothing if he hadn't put his hands on me."

 Herrmann returns and works in the background. In addition to speaking with Herrmann,
appellant sporadically attempts to engage in conversation with Caldwell and Gray. He looks into the
camera occasionally. Looking into the camera appellant looks down at his shoes, and states, "I got blood
on my chucks [shoes], man. Damn."

 As Herrmann treats him, appellant states that Herrmann should have tended to Demorest
first because he needed attention more than did appellant. When Herrmann indicates her belief that both
men were hurt the same amount, appellant disagrees and laughs.

 Prior to evidence being presented at the guilt/innocence phase of the trial, appellant
objected to the admission of the audio portion of the videotape on the basis that it contained incriminating
statements that were made as a result of custodial interrogation and in the absence of any warnings under
Miranda v. Arizona, 384 U.S. 436 (1966). At a hearing out of the jury's presence, Gray testified that
no one read appellant his Miranda rights. The trial court overruled appellant's objection, finding that the
tape did not contain any interrogation. Appellant renewed his objection when the videotape was offered
in evidence; the trial court again overruled his objection.

 In his first point of error, appellant urges that the trial court erred in admitting the videotape
of appellant's incriminating statements because the statements were products of custodial interrogation
made in the absence of Miranda warnings; therefore, the admission of the statements violated appellant's
Fifth Amendment rights.

 

[T]he Miranda safeguards come into play whenever a person in custody is subjected to
either express questioning or its functional equivalent. This is to say, the term
"interrogation" under Miranda refers not only to express questioning, but also to any
words or actions on the part of the police (other than those normally attendant to arrest
and custody) that the police should know are reasonably likely to elicit an incriminating
response from the suspect. The latter portion of this definition focuses primarily upon the
perceptions of the suspect, rather than the intent of the police. This focus reflects the fact
that the Miranda safeguards were designed to vest a suspect in custody with an added
measure of protection against coercive police practices, without regard to objective proof
of the underlying intent of the police. A practice that the police should know is reasonably
likely to evoke an incriminating response from a suspect thus amounts to interrogation. 
But, since the police surely cannot be held accountable for the unforeseeable results of their
words or actions, the definition of interrogation can extend only to words or actions on the
part of police officers that they should have known were reasonably likely to elicit an
incriminating response.


Rhode Island v. Innis, 446 U.S. 291, 300-302 (1980) (footnotes omitted).

 Appellant argues that the officers should have known that the use of the video camera in
the infirmary was reasonably likely to elicit an incriminating response from appellant. Once he
demonstrated a proclivity to speak to the camera and make incriminating statements, appellant says the
taping became an interrogation and he should have been warned of his Miranda rights. Appellant insists
that the failure to warn him rendered his incriminating statements inadmissible under the Fifth Amendment.

 Appellant, who was in custody, was not subjected to express questioning when he made
the statements shown by the videotape. The issue is whether the circumstances show appellant was
subjected to the "functional equivalent" of interrogation. Appellant compares the circumstances in this case
to those in Rhode Island v. Innis, and insists that applying the rules of Innis would lead to a different result
than that reached in Innis. Innis, who was suspected of crimes committed with a shotgun, did not possess
the gun when arrested. Police, while taking Innis to jail, discussed among themselves the possibility that
a handicapped child from a nearby school might injure himself if the child should find the gun. Innis, who
had been advised of his Miranda rights, after hearing the officers conversation, led the officers into the
woods near the school and pointed out the gun. The Supreme Court held that the dialogue between the
officers did not invite Innis's response. Innis, 446 U.S. at 302.

 Appellant argues that his "childish tendency to talk in front of the camera, and even to
address the camera directly" should have made the officers aware of appellant's "particular susceptibility
to the video camera." Although there are some differences in the circumstances in Innis and in this case
they are not differences that require a different result. We conclude that the circumstances of this case do
not show the functional equivalent of interrogation.

 "Volunteered statements of any kind are not barred by the Fifth Amendment." Miranda,
384 U.S. at 478. We hold that appellant's statements were volunteered and that they did not result from
interrogation or its functional equivalent. Appellant was not deprived of his Fifth Amendment rights. The
trial court did not err in admitting in evidence the videotape. Appellant's first point of error is overruled. 


 In his second point of error, appellant contends that the evidence is factually insufficient to
sustain his conviction, because the evidence does not support the allegation of the indictment that appellant
used his hands as a deadly weapon. It was alleged that "on or about the 3rd day of March, A.D. 1996,
. . . Devlin Jefferson intentionally or knowingly caused bodily injury against Richard Demorest, a person
Devlin Jefferson knew was a public servant while Richard Demorest was lawfully discharging an official
duty, or in retaliation or on account of an exercise of official power or performance of an official duty as
a public servant, by striking Richard Demorest with his hands, and Devlin Jefferson used or exhibited a
deadly weapon, namely, his hands, during the commission of the assault."

 In reviewing factual sufficiency of the evidence we view all the evidence without the prism
of "in the light most favorable to the prosecution;" we set aside the jury's verdict only if it is so contrary to
the overwhelming weight of the evidence as to be clearly wrong and unjust. See Clewis v. State, 922
S.W.2d 126, 129 (Tex. Crim. App. 1996). Clewis approved this standard of review first articulated in
Stone v. State, 823 S.W.2d 375, 381 (Tex. App.--Austin 1992, pet. ref'd untimely filed). More recently
the Court of Criminal Appeals has admonished: "We emphasize that in performing a factual sufficiency
review, the courts of appeals are required to give deference to the jury verdict, examine all of the evidence
impartially, and set aside the jury verdict 'only if it is so contrary to the overwhelming weight of the evidence
as to be clearly wrong and unjust.'" Cain v. State, 958 S.W.2d 404, 410 (Tex. Crim. App. 1997)
(quoting Clewis, 922 S.W.2d at 129).

 There are additional facts to be considered in determining factual sufficiency. Appellant
struck Demorest in the face several times with his fist. Demorest was stunned by the first blow, then could
not see after the second. He backed away, taking several swings at appellant to hold him at bay. 
Demorest testified that he made contact with appellant four times. He used a pair of handcuffs as a
weapon, holding them by the chain that connects the two individual handcuffs. Officer Gray verified that
Demorest hit appellant with the handcuffs. The incident was over quickly, as Officers Gray and Caldwell
intervened. Demorest handed the cuffs to the officers and they restrained appellant. Appellant offered no
resistance to being cuffed. Demorest testified that appellant committed the assault with his right fist. Officer
Howell testified to the same fact. Officer Gray testified that appellant used both his hands to hit Demorest.

 Demorest testified that he felt sore and hurt after the assault. He had blurred vision for
three weeks and at the time of trial still had increased sinus problems. He had a scar in one eyebrow. His
teeth had to be filed, and his jaw began popping occasionally. Demorest admitted that he had suffered from
sinus problems prior to the incident, and continued to smoke despite advice from a doctor that smoking
aggravates sinus conditions. Several photographs were admitted showing Demorest soon after the incident.

 Dr. Sherry Ross, an emergency room doctor, testified that appellant suffered a broken nose
and three lacerations above his left eye. There was bruising around the eye and some bleeding in the eye. 
She used fourteen stitches to close the lacerations. She referred Demorest to a plastic surgeon for possible
further treatment of the broken nose. Dr. Ross testified that the act of hitting someone in the face could
result in serous bodily injury. She recited several hypothetical injuries, including double vision from
entrapped eye muscles, aspirated blood from a broken nose, swallowed teeth, a dislocated jaw, nasal
bones being driven into the brain, blindness from compression of the eyeball, cataracts from blood
collecting behind the cornea of the eye, and a punctured eye from shattered eyeglass lenses.

 On cross-examination, Dr. Ross testified that serious bodily injury can result from many
everyday events, including "[t]ripping and falling off a curb." She had seen fistfight victims in worse
condition than Demorest. He reported no loss of consciousness and was discharged from the emergency
room in a little over two hours. Demorest was not subject to a substantial risk of death.

 Dr. Robert Weber, a plastic surgeon, testified that he saw Demorest five days after the
incident. Demorest had bruising chiefly around his left eye. His nose was swollen, and he reported
numbness to the cheek. His jaw was sore. Weber determined that Demorest's nose was broken. 
However, the nose was minimally displaced, and Weber did not perform surgery to move or straighten the
nose. Demorest had not lost his sense of smell or taste. Webber testified that the act of hitting someone
repeatedly in the face with one's hands may cause serious bodily injury or death. Usually, the resulting
injury consists of scarring or a change in facial appearance. More rarely, the victim can suffer brain
damage, blindness, a loss of the sense of smell, or blurred vision from entrapped eye muscles.

 A deadly weapon may be anything that in the manner of its use is capable of causing death
or serious bodily injury. See Tex. Penal Code Ann. § 1.07(17)(B) (West 1994). Serious bodily injury is
bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement,
or protracted loss of any bodily member or organ. Id. § 1.07 (46). Hands are not deadly weapons per
se but can become deadly weapons in the manner of their use depending upon the evidence. Turner v.
State, 664 S.W.2d 86, 89-90 (Tex. Crim. App. 1983); Judd v. State, 923 S.W.2d 135, 140 (Tex.
App.--Fort Worth 1996, pet. ref'd); Cooper v. State, 773 S.W.2d 749, 750 (Tex. App.--Corpus
Christi 1989, no pet.). When the State alleges the use of a deadly weapon, not deadly per se, it must prove
beyond a reasonable doubt that the weapon alleged was used in a manner capable of causing death or
serious bodily injury. See Hill v. State, 913 S.W.2d 581, 584 (Tex. Crim. App. 1996); Hester v. State,
909 S.W.2d 174, 179 (Tex. App.-- Dallas 1995 no pet.). However, the State need not show that the
hands actually caused serious bodily injury so long as it shows that the hands in the manner of their use
were capable of causing serious bodily injury. See Brooks v. State, 900 S.W.2d 468, 472 (Tex. App.--
Texarkana 1995, no pet.); Clark v. State, 886 S.W.2d 844, 845 (Tex. App.--Eastland 1994, no pet.);
Gillum v. State, 888 S.W.2d 281, 288 (Tex. App.--El Paso 1994, pet. ref'd).

 We have applied the standard of review required by Cain, Clewis, and Stone; after
examining all of the evidence impartially and giving deference to the jury's verdict, we conclude that the
jury's verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong or
unjust. We hold that the evidence is factually sufficient to support the jury's verdict and overrule appellant's
second point of error.

 The trial court's judgment is affirmed.



 

 Carl E. F. Dally, Justice

Before Chief Justice Yeakel, Justices Aboussie and Dally*

Affirmed

Filed: July 30, 1998

Publish












* Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. See Tex.
Gov't Code Ann. § 74.003(b) (West 1988).



ar"> On cross-examination, Dr. Ross testified that serious bodily injury can result from many
everyday events, including "[t]ripping and falling off a curb." She had seen fistfight victims in worse
condition than Demorest. He reported no loss of consciousness and was discharged from the emergency
room in a little over two hours. Demorest was not subject to a substantial risk of death.

 Dr. Robert Weber, a plastic surgeon, testified that he saw Demorest five days after the
incident. Demorest had bruising chiefly around his left eye. His nose was swollen, and he reported
numbness to the cheek. His jaw was sore. Weber determined that Demorest's nose was broken. 
However, the nose was minimally displaced, and Weber did not perform surgery to move or straighten the
nose. Demorest had not lost his sense of smell or taste. Webber testified that the act of hitting someone
repeatedly in the face with one's hands may cause serious bodily injury or death. Usually, the resulting
injury consists of scarring or a change in facial appearance. More rarely, the victim can suffer brain
damage, blindness, a loss of the sense of smell, or blurred vision from entrapped eye muscles.

 A deadly weapon may be anything that in the manner of its use is capable of causing death
or serious bodily injury. See Tex. Penal Code Ann. § 1.07(17)(B) (West 1994). Serious bodily injury is
bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement,
or protracted loss of any bodily member or organ. Id. § 1.07 (46). Hands are not deadly weapons per
se but can become deadly weapons in the manner of their use depending upon the evidence. Turner v.
State, 664 S.W.2d 86, 89-90 (Tex. Crim. App. 1983); Judd v. State, 923 S.W.2d 135, 140 (Tex.
App.--Fort Worth 1996, pet. ref'd); Cooper v. State, 773 S.W.2d 749, 750 (Tex. App.--Corpus
Christi 1989, no pet.). When the State alleges the use of a deadly weapon, not deadly per se, it must prove
beyond a reasonable doubt that the weapon alleged was used in a manner capable of causing death or
serious bodily injury. See Hill v. State, 913 S.W.2d 581, 584 (Tex. Crim. App. 1996); Hester v. State,
909 S.W.2d 174, 179 (Tex. App.-- Dallas 1995 no pet.). However, the State need not show that the
hands actually caused serious bodily injury so long as it shows that the hands in the manner of their use
were capable of causing serious bodily injury. See Brooks v. State, 900 S.W.2d 468, 472 (Tex. App.--
Texarkana 1995, no pet.); Clark v. State, 886 S.W.2d 844, 845 (Tex. App.--Eastland 1994, no pet.);
Gillum v. State, 888 S.W.2d 281, 288 (Tex. A