11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Lon Kieferdorf Lane

Appellant

Vs.                   No.
11-01-00343-CR B Appeal from Dallas County

State of Texas

Appellee

 

The jury
convicted Lon Kieferdorf Lane of the aggravated assault of Cindy Lane, his
wife.  After a presentence
investigation, the trial court assessed appellant=s punishment at  confinement for
35 years.  We affirm.

                                                                   The
Indictment

The
indictment charged that on or about January 20, 2001, appellant intentionally,
knowingly, and recklessly caused bodily injury[1]
to Cindy Lane by striking her with his hand and by kicking her with his foot
and that appellant Adid
use and exhibit a deadly weapon [his hand and foot] during the commission of
the assault.@  The
indictment also alleged that appellant had two prior felony convictions, an
aggravated robbery conviction in 1992 and a robbery conviction  in 1990.[2]

                                                               Relevant Testimony

There is
no dispute that appellant and his wife were at home by themselves when she was
injured; that appellant called A9-1-1@ for assistance; and that appellant=s wife was taken to the hospital by
ambulance.  The main dispute at the time
of trial was whether appellant=s wife was telling the truth when she said that appellant hit her and
kicked her or whether she was telling the truth when she said that she fell
down the stairs and hurt herself. 








Greg
Minter of the Garland Fire Department testified that he was working as a
paramedic on January 20, 2001, at 12:45 a.m., when he was sent to a residence
at 323 Valley Park in Garland.  An
engine crew from a different station was already there, and the paramedic from
that crew had begun the care of the patient before Minter arrived.  Minter was Abriefed@ on what had been done before he
arrived.  Minter said that he rode in
the back of the ambulance with the patient on the way to the hospital.  Relevant portions of Minter=s testimony during direct examination by the
prosecutor read as shown:

Q: Now,
once you get a person into the back of the ambulance and then are transporting
them, do you have a certain procedure or protocol?  I mean if you put somebody in your ambulance, what do you do with
them?

 

A: The
type of injury dictates what I do, my protocol.  In her case it was - - told me that this was from a fall possibly
down some stairs.  So you=re looking at traumatic injury.  I asked the patient [appellant=s wife] what was wrong with her.  She was complaining of right-sided head pain
and right-sided chest pain.

 

Q: Did she
appear to be in a lot of pain to you?

 

A: She
was.  She did appear to be in quite a
bit of pain.

 

                                                            *   *  
*

 

Q: And as
part of your duties as a paramedic, is it necessary for you to ask a person
what happened to them in order to make a medical diagnosis for treatment?

 

A:
Sure.  We need to know the events that
caused the injury, you know, in detail to help us treat her and also when we
give information to the hospital.

 

[After
appellant made a Ahearsay@ objection under TEX.R.EVID. 802 to the State=s question about the response by appellant=s wife, the State urged two exceptions to
that rule:  (1) statements under
TEX.R.EVID. 803(4) which are made for the purpose of medical diagnosis or
treatment and (2) statements under TEX.R.EVID. 803(2) which are Aexcited utterances.@]   

 

THE COURT:
Overruled.

 

Q: What
did she say had happened to her, sir?

 

A:
Initially she didn=t
answer me.  She was upset and
crying.  I pursued it, asked her again,
because that=s something we need to know. And that=s when she informed me that she was hit by
her husband.  (Emphasis added)

 








When asked
to explain what he meant when he said that he Apursued it,@
Minter explained that he told his patient that he needed to know what had
happened in order to help her and that he asked her Ahow far down the steps@ she had fallen and Ahow many steps@ she had hit.  Minter
identified the Aemergency medical services@ report which he prepared, and a redacted
copy of that report was admitted into evidence.  That report showed that the patient was vomiting and nauseated
while en route to the hospital, that she had tenderness to the right chest and
right rib region, that she had pain in the occipital region, and that she said
that Aher husband had hit her.@ 
Minter also testified that a fist hitting a person=s head could be capable of causing serious
bodily injury.  On cross-examination,
Minter agreed that the patient told the first paramedic that she had Afallen down the stairs.@  This
was the information which had been passed on to him by the first
paramedic.  Minter also agreed with
appellant=s attorney that the patient did not have any Aobvious deformities@ and that she was rational when he talked to
her.  








Ralph
Autrey testified that he was a registered nurse, that he had 21 years
experience, and that he was working in the emergency room at the Garland
hospital when Cindy was brought to the hospital by ambulance.  Nurse Autrey said that this patient came to
the emergency room at 1:25 a.m. on January 20 and that he did the nursing
assessment on her. After the hearsay objection was overruled, Nurse Autrey said
that the patient told him that Ashe was assaulted by her husband.@ 
(Emphasis added)  Nurse Autrey
also testified that his notes do not show anything about her Ahaving fallen down any stairs.@  The
nursing notes also show that she had contusions to the right side of her head, that
she had old bruises on her breast, that she was tender in the gastric region,
and that she complained of pain in the lumbar region of her back.  Nurse Autrey said that his notes showed that
she was Aawake, alert, [and] oriented to date, time
and place.@ 
Nurse Autrey also testified that a Ablow from a fist@ was capable of causing serious bodily injury if it is hard enough and
in the right location.  On
cross-examination, Nurse Autrey agreed that he did not find any broken bones,
that he did not document any bleeding or bloody areas, that the patient=s vital signs were stable, that he did not
see any permanent disfigurement, and that there did not appear to be any
life-threatening injuries.       

Officer
Shawn Roten of the Garland Police Department testified that the dispatcher sent
him and Officer Scott William Lichtenberg to the Baylor Garland Hospital on
January 20, 2001, at 1:32 a.m. to see a female in the emergency room who Awas alleging an assault had occurred.@ 
Officer Roten said that Cindy was in the emergency room, that she was in
bed, that it was a private area, that the nurse may have been in and out, but
that the two officers and Cindy were the only other ones in the room.  Officer Roten said that Cindy Alooked like she was in pain,@ that she was Anot moving much, moaning a little,@ and that her Aeyes
were watery.@ 
Officer Roten said that they determined that the cause of the pain was
within an hour of the time they arrived and that Cindy was still suffering from
the pain.  After a hearsay objection,
the officer asked her why she had not reported the assault immediately.  Relevant portions of his testimony read as
shown:

Q: What
was her response?

 

A: She
figured that her husband may kill her if she reported the assault.

 

[After another hearsay objection was
overruled on the basis of the excited utterance exception, the testimony
continued.]

 

Q:
Officer, what specifically did she tell you had happened, how she suffered her
injuries?

 

A: Her and
her husband Lon Lane had an argument. 
She was sitting on the sofa.  He
struck her several times with a closed fist to the back of her head and then
once to the right side of her forehead area. 
She fell out of her chair, at which point he kicked her in the stomach
and the back.  (Emphasis added)

 

Officer
Roten said that, when he asked her why she had told the paramedics that she had
fallen on the stairs, she said that she was Aafraid that her husband would kill her@ if she had told them what had happened.  Officer Roten identified the photograph which was taken and which
showed the way appellant=s wife looked that night. 
Officer Roten also testified that appellant=s wife was Avery rational and very coherent with her responses@ when they talked to her.  Officer Roten also testified that the hands
and feet can be used as deadly weapons if the victim is hit on the head or
kicked in the back or chest.  Officer
Roten also identified appellant as the man that they arrested after talking to
his wife in the emergency room.  








Officer
Scott William Lichtenberg of the Garland Police Department testified that he
was working with Officer Roten on January 20, 2001, when they investigated a
family violence assault.  Officer
Lichtenberg testified that appellant=s wife appeared to be Aemotionally rattled,@ that her voice was Avery timid and slow,@ that she appeared to be Ain a lot of pain and a lot of stress,@ and that she had some visible injuries.  Officer Lichtenberg testified that Officer Roten conducted the
interview and that he observed the interview. 
Relevant portions of his testimony on direct examination by the
prosecutor read as shown:

Q:
Specifically then will you tell the jury what did [appellant=s wife] say was the source of her injuries?

 

[DEFENSE
COUNSEL]: Objection.  Hearsay.

 

[PROSECUTOR]:
Offer this under the excited utterance exception, Your Honor.

 

THE COURT:
Overruled.

 

Q:
Specifically, how did she say that she received these injuries?

 

A:
[Appellant=s wife] stated to us that the defendant
had struck her with his fist on the back of her head and on the side of her
head causing her to fall out of a chair in which she was seated in.  Once she went to the ground, she stated that
he then kicked her with his feet in the lower back and then in the chest area.

 

Q: Did she
report whether or not she had lost consciousness?

 

A: She did
state that she lost consciousness sometime after that.

 

Q: Did you
ask her - - did she say anything about having received any injuries from
falling down stairs?

 

A: No, ma=am.

 

Q: Did you
ask her about that, whether or not that had been - - that report had been made
earlier?

 

A: I
believe Officer Roten asked her about that.

 

Q: What
was her response to that, if you recall?

 

A: She
stated that she told other people that because she was fearful of repercussions
or reprisal from her husband.  (Emphasis
added)

 








Officer
Lichtenberg testified that he made the decision to arrest appellant and that he
participated in that arrest.  He
identified appellant in open court as the man who was arrested.  Officer Lichtenberg also testified that it
was not unusual for individuals who are fearful of retaliation to first tell
one story, then tell a different story when they are separated from the person,
and then change their story again later. 
He said this is particularly true in areas of family violence.  He also testified that police officers are
taught not to hit people in the head or around the spine because blows to those
areas can be potentially damaging.  He
also said that the hands and feet can be used to cause serious bodily injury.  Officer Lichtenberg reviewed the offense
report and said that it showed that appellant=s wife said that appellant hit her in the head Awith a closed fist@ and that she had been Akicked in the lower back and in the chest@ by appellant=s foot.

Investigator
Kelly Brasher of the Garland Police Department identified the pictures which
she took of appellant=s wife
in the emergency room.  

After the
State rested, the court overruled appellant=s motion for a directed verdict. 
Then  appellant=s wife and mother testified in his
behalf.  Appellant did not testify.  

Anna Lane,
appellant=s mother, testified that she went to
appellant=s house on January 20 after he called her on
the telephone.  Anna testified that
Cindy was lying on the floor, that Cindy said that she had fallen, and that
Cindy said that her head was hurting. 
Anna went to the store to purchase some aspirins for Cindy, and
appellant called the paramedics after Anna got back from the store.  Anna went to the hospital in her own car
after the ambulance took Cindy  to the
hospital.  During cross-examination by
the prosecutor, Anna said that appellant told her that Cindy Afell down the stairs@ when he called her to come over to their
house.

Cindy
testified that she was married to appellant and that they had been arguing on
the evening that she was injured because she thought he was Acheating@ on her.  She said that it was a
Aheated argument.@ 
Relevant portions of her testimony on direct examination by appellant=s attorney read as shown:

Q: Did you
at any time strike him?

 

A: No, I
didn=t strike him.

 

Q: And did
he at any time strike you?

 

A: No, he
never struck me.

 

Q: And
the injuries that you received...how did you get those?








 

A: When
I stormed out of the room and ran down the stairs and took the stairs a little
bit too swiftly, I missed my step.  We
have a bannister that juts out.  It=s like a wrought iron bannister.  And I tumbled down the stairs and hit that
as I went down the stairs.
(Emphasis added)       

 

            Cindy also testified that she and
appellant own a two-story town home and that they were upstairs when the
argument started.  Cindy said that it
was close to midnight, that they were dressed for bed, and that appellant was
not wearing shoes.  Cindy said that she
missed one of the top steps when she Astormed out of the bedroom@ and ran down the hallway to the stairs.  Cindy said that she fell from the very top of the circular
stairway and that she landed on the floor in the foyer by the dining room.  Cindy said that appellant wanted to call A9-1-1@ but that she told him to call his mother.  Cindy said that she had a Apretty close relationship@ with appellant=s mother.  Cindy said that Anna
got there very quickly and that Cindy asked Anna to get her some Tylenol or
aspirin.  Cindy said that appellant was
worried about her and that he called A9-1-1@ for assistance.  Cindy testified that, when the paramedics got there, she told
them that she had fallen down the stairs. 
Cindy said that they put her on a stretcher and then put her in an
ambulance.  Relevant portions of her
testimony on direct examination read as shown:

Q: And then on the way to
the hospital you had a conversation with one of the paramedics in the back?

 

A: Right.

 

Q: And what did you tell
that paramedic in the back?

 

A: By that time a little
time had passed, and I had grown angrier and angrier.  And I told him that my husband had did it to me.

 

Q: What did you tell
him?  Did you tell him that your husband
pushed you down the stairs or what?

 

A: I told him that he
beat me up.  I told him that he hit me
and that he kicked me and beat me up. 
And he didn=t.  I was just so angry.

 

Q: Why did you lie to
them, Ms. Lane?

 








A: I just wanted him to
hurt like I was hurting.  I=m sorry. 
I never thought it would get this far....I wasn=t thinking correctly.  I was dazed.  I was shook up.  I never
thought this would happen.  And I kept
asking for them - - right after it happened - - I mean, every time I talked to
the DA=s Office I asked them to drop charges,
everything.

 

                                                            *   *  
*

 

Q: And you told that
story again to the police at the hospital?

 

A: Yes.  When they came and they asked me, I told
them that=s what happened; that he had beat me up.  Because I saw it as a perfect
opportunity.  It just fell into place.

 

                                                            *   *  
*

 

Q: Have you-all since
reconciled?

 

A: Yes.

 

Q: Have you found out who
that number belonged to that you found [and which caused her to think appellant
was Acheating@ on her]?

 

A: Yes, and that=s the most embarrassing part, because I was
so wrong.

 

                                                            *   *  
*

 

Q: What about the fact
that you indicated during your conversation with the police that you were
fearful that he was going to kill you?

 

A: Of course I was going
to say that.  I was mad.  I wanted to tell them anything to hurt
him.  I was jealous.  I was insecure.  I was very angry.

 

                                                            *   *  
*

 

Q: And you know it doesn=t really look good that you=re changing your stories?

 

A: I realize that.

 

Q: And so the question
could be asked, Ms. Lane, that if you lied at one time, what would make this
court and this jury not think that you=re not lying today?

 








A: Because I=m not mad right now.  I=m just regretful that I was so mad that night and regretful that I didn=t tell the truth that night.  Because I never thought this would
happen.  And anger makes you say things
and jealousy makes you say really horrible things that you don=t mean.

 

During her
cross-examination by the prosecutor, Cindy reviewed the statement which she
gave to the police on February 6, 2001. 
In that statement, she claimed that she fell down the stairs and that
she gave the other version because she was Ain a haze and not being able to think clearly.@  In that statement, she claimed that she had a
concussion and that she Ablacked out twice@ while waiting for the paramedics after her husband called A9-1-1.@  Also, she did not mention
anything in that statement about anger or infidelity.  

                                           Points
of Error

Appellant
presents only two points of error. 
Appellant argues in his first point that the evidence is Alegally@ insufficient.  Appellant argues
in his second point that the trial court erred in admitting evidence of hearsay
statements by the complaining witness.

                                              Sufficiency
of the Evidence

Appellant=s claim that the evidence was Alegally@ insufficient has been reviewed under the test stated in Jackson v.
Virginia, 443 U.S. 307, 319 (1979).  See
also Vasquez v. State, 67 S.W.3d 229, 236 (Tex.Cr.App.2002).  The jury was the Aexclusive judge of the credibility of the
witnesses,@ and the reconciliation of conflicts in the
testimony is within the Aexclusive province of the jury.@  TEX. CODE CRIM. PRO. ANN.
arts. 36.13 & 38.04 (Vernon 1979 & 1981); Jones v. State, 944 S.W.2d
642, 647 (Tex.Cr.App.1996), cert. den=d, 522 U.S. 832 (1997).

While we
agree with appellant that the evidence does not show that appellant caused Aserious bodily injury@ to his wife, that is not the end of our
inquiry.  TEX. PENAL CODE ANN. ' 22.02 (Vernon 2003) provides that a person
can commit the offense of Aaggravated assault@ in two different ways.  Under
Section 22.02(a)(1), the offense is committed if the person commits an assault
and Acauses serious bodily injury to another.@ 
Under Section 22.02(a)(2), the offense is committed if the person
commits an assault and Auses or exhibits a deadly weapon during the commission of the assault.@ 
Section 22.02(a)(2) does not require proof of a Aserious bodily injury@; it only requires proof of a Abodily injury.@  See TEX. PENAL CODE ANN. ' 22.01 (Vernon 2003).  The jury was authorized to convict appellant
of aggravated assault if it found that he caused Abodily injury@ to
his wife while using his hand or foot as a deadly weapon.  








See Clark
v. State, 886 S.W.2d 844 (Tex.App. - Eastland 1994, no pet=n), where this court held that the acquittal
of causing Aserious bodily injury@ was not inconsistent with an affirmative Adeadly weapon@ finding.  This court said:

To support
a deadly weapon finding, the State must show that appellant=s hands or feet in the manner of their use
or intended use were capable of causing death or serious bodily injury.  TEX. PENAL CODE ANN. ' 1.07(a)(17)(B) (Vernon 1994).  The State need not show that the hands or
feet actually did cause serious bodily injury....Furthermore, a showing
that the defendant used his hands or feet in a manner capable of causing
serious bodily injury, even absent the intent to do so, will support a
deadly weapon finding.  (Emphasis
added)

 

Clark v. State, supra at
845; see also Jefferson v. State, 974 S.W.2d 887, 892 (Tex.App. - Austin 1998,
no pet=n). 
The first point of error is overruled.

                                                            The
Hearsay Objections

The trial
court did not err in overruling appellant=s Ahearsay objections.@  In
Zuliani v. State, 97 S.W.3d 589, 595 (Tex.Cr.App.2003), the court discussed the
admissibility of out-of-court statements under Athe exceptions to the general hearsay exclusion rule.@  The
court said in Zuliani that the admissibility of these statements is Awithin the trial court=s discretion@ and that the appellate courts should not reverse a discretionary
ruling Aunless a clear abuse of discretion is shown.@  The
court in Zuliani then pointed out that such an abuse of discretion is
not shown unless the trial court=s ruling Awas so
clearly wrong as to lie outside the zone within which reasonable persons might
disagree.@  See
also Coffin v. State, 885 S.W.2d 140, 149 (Tex.Cr.App.1994); Cantu v. State,
842 S.W.2d 667, 682 (Tex.Cr.App.1992), cert. den=d, 509 U.S. 926 (1993). 

The court
in Zuliani v. State, supra at 595-96, discussed an  Aexcited utterance@ under TEX.R.EVID. 803(2) (AA statement relating to a startling event or
condition made while the declarant was under the stress of excitement caused by
the event or condition@).  The court explained that the basis for this
exception is Apsychological,@ noting that a person who is in the instant grip of  violent emotion, excitement, or pain
ordinarily loses the capacity for reflection necessary to the fabrication of a
falsehood and that, consequently,  the Atruth will come out.@  The
court then said: 

[T]he statement is trustworthy because it
represents an event speaking through the person rather than the person speaking
about the event.

 








In determining whether a hearsay statement is admissible
as an excited utterance, the court may consider the time elapsed and whether
the statement was in response to a question. 
However, it is not dispositive that the statement is an answer to a
question or that it was separated by a period of time from the startling event;
these are simply factors to consider in determining whether the statement is
admissible under the excited utterance hearsay exception.

 

The
critical determination is Awhether the declarant was still dominated by the emotions, excitement,
fear, or pain of the event@ or condition at the time of the statement.  Stated differently, a reviewing court must determine whether the
statement was made Aunder
such circumstances as would reasonably show that it resulted from impulse
rather than reason and reflection. 
(Citations omitted)

 

The
evidence supports the trial court=s ruling that the statements made to the medical personnel and to the
police officers on the night of the offense were admissible as Aexcited utterances@ under Rule 803(2).  Moreover, the statements to the medical personnel were also
admissible under Rule 803(4) because they were pertinent to the diagnosis and
treatment of appellant=s
wife.  The second point of error is
overruled. 

                                                    This
Court=s Ruling

The judgment of the trial court is affirmed.

 

BOB DICKENSON

SENIOR JUSTICE

 

June
5, 2003

Publish.  See TEX.R.APP.P. 47.2(b).

Panel consists of:  Arnot, C.J., and

McCall, J., and
Dickenson, S.J.[3]











[1]The indictment also charged that appellant caused Aserious bodily injury@
to Cindy Lane by striking her with his hand and by kicking her with his foot.





[2]Since appellant pleaded Atrue@ to both allegations, TEX. PENAL CODE ANN. ' 12.42(d) (Vernon 2003) provides that the range of
punishment is confinement for not less than 25 years to not more than 99 years
or life.





[3]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.