# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00254-CR

**William Goode, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
### NO. D-1-DC-09-301157, HONORABLE FRED A. MOORE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

William Goode was convicted of family-violence aggravated assault with a deadly weapon, *see* Tex. Penal Code Ann. § 22.02 (West 2003), and retaliation, *see id*. § 36.06 (West Supp. 2010), and was sentenced to two concurrent forty-five year sentences. Goode appeals his convictions, challenging the sufficiency of the evidence supporting each. Because the evidence is sufficient to support the jury's findings of guilt, we affirm the trial court's judgments of conviction.

## BACKGROUND

On May 23, 2009, Gina Wilson, who had been dating Goode for about two weeks, left her dog at Goode's rural Travis County home while she spent time with friends.[1] When she returned to pick up her dog, Wilson told Goode that she was tired and did not want to go into Austin

---

[1] The facts recited herein are taken from the testimony and exhibits admitted at trial.

for the night as they had previously planned. In response, Goode became upset and tried to take Wilson's keys away from her. The next day, Goode called and text-messaged Wilson repeatedly, apologizing for his behavior the previous night. That evening, while at a friend's house, Wilson's phone was "ringing off the hook" with calls from Goode's number. When Wilson finally answered, Dante Beard, Goode's roommate and Wilson's close friend, told her that Goode was attempting to kill himself and that Wilson needed to come to the house and talk to him. Wilson testified that she was reluctant to return to Goode's residence after the incident the night before, but felt obligated to try to help.

Wilson arrived at Goode's home at approximately midnight on the night of May 24 and found Goode locked in his bedroom. When Wilson threatened to leave if he did not open the door, Goode let her into the room. He then showed her a note typed on his computer that said that he loved her. Wilson replied, saying, "No matter what you have to say to me right now, I really don't care," and that she was only there because Beard told her that Goode was trying to kill himself. Goode became angry and punched a large hole in his bedroom door. He then picked up a utility knife, held it up to his throat, and said, "You're going to sit here and watch me kill myself." Wilson began screaming, told him to stop, and attempted to leave. Goode pushed Wilson onto the bed with the knife still in his hand, at which point Wilson testified that she thought she was going to die. Goode then picked up a cable that was tied as a noose and said, "This is for you, bitch; you're going to die tonight." Wilson testified that Goode was acting "crazy" and "erratic" and that his face looked blank and evil. Goode then climbed on top of Wilson, who was yelling and screaming, and knelt over her.

2

While struggling with Goode on the bed, Wilson attempted to unlock her phone to call 911. Goode responded by saying, "I have my guns in the house. Go ahead and call 911, bitch. Everybody will die if you do."[2] Still kneeling over her, Goode punched Wilson in the left side of her head with his fist. Wilson then kicked Goode off of her and rolled onto her stomach in an attempt to crawl away.

Goode grabbed Wilson by her throat, first with one hand, then with both, and Wilson rolled onto her back, trying to escape. Wilson testified that she was gasping for air and was terrified that she "wasn't going to get out if it." In an effort to persuade Goode to stop strangling her, Wilson ceased fighting and told Goode that she "wanted to be there" and would stay with him. Goode then got off of Wilson and laid on the bed. After a failed attempt to convince Goode that she needed to leave the house, Wilson went into the living room and put a bag of frozen french fries on her head where Goode had punched her. Soon after Wilson entered the living room, Beard and his girlfriend, Taryn Vannoy, came into the house from the front porch. When Beard went into the back of the house to find Goode, Wilson told Vannoy that Goode "beat the shit out of [her]." Goode and Beard returned to the living room and Wilson, accompanied by Goode, went outside to retrieve pajamas from her car. While outside, Wilson placed her phone in between her car's seats to hide it from Goode. Wilson testified that Goode "stayed close" and that she would not have been able to leave.

When Wilson refused to sleep in Goode's room, Goode brought a mattress into the living room, where he spent the night with her. Wilson testified that she hid her keys under the

---

[2] Wilson testified that she had seen a black handgun under Goode's bed when she walked into his bedroom. Goode had also mentioned to Wilson in prior conversations that he owned an AK-47, though Wilson had never seen it.

3

mattress and was planning to leave after Goode fell asleep. At around 4 a.m., Goode found Wilson's keys, accused her of plotting to leave, and threw her keys into his bedroom.

The next morning, Goode told Wilson that if she went to the police he would "kill [her] and [her] whole family." Goode also advised Wilson that in order to explain her injuries, she should tell everyone that she and Goode's "baby mama" got into a fight.

Eventually, Goode, Wilson, Beard, and Vannoy left the house and drove to a gas station. Because Goode was concerned that Wilson would go to the police, he insisted that Beard and Vannoy drive his car, so that he could ride with Wilson. Wilson left from the gas station alone to go to work. After Wilson left, she called her mother and told her that they needed to go home and pack suitcases because Goode knew where they lived and they were not safe at home. Wilson's mother told Wilson to instead meet her at the hospital. Once Wilson arrived, Wilson's mother called the police.

While at the hospital, Wilson received approximately twenty calls and text messages from Goode. That night, Wilson received a text message from Goode with a photograph of the apartment complex where Wilson was staying with a friend and her friend's 17-month-old child. The text read "1st." Wilson testified that she believed the message was in reference to Goode's threat to "kill every member of my family and people I cared about, starting from the youngest one." Wilson later received another text message with a photograph of her mother's house and the word "2nd."

At some point after Goode was arrested, Wilson began speaking to him again. Wilson regularly visited Goode in jail and wrote him letters. She testified that at the time, she believed she

4

loved him. At Goode's instruction, Wilson went to Goode's trial attorney's office to sign a non-prosecution affidavit. Once there, Goode's attorney informed her that she needed to go to the district attorney. Wilson ultimately decided against a non-prosecution affidavit after the district attorney played her a jailhouse call between Goode and Latrice, the mother of his child, in which Goode asked Latrice to find someone to kill Wilson, stating, "I want the bitch dead, Latrice. Do you understand? . . . Get a hold of them boys, the ones I've been tellin' you to. The ones I've been telling you to from day one." After hearing the recording, Wilson cut off communication with Goode.

At Goode's jury trial, Vannoy corroborated Wilson's account of the events. She testified that she and Beard had to call Wilson multiple times to convince her to come over to Goode's house on the evening of the assault. Vannoy also testified that after Wilson arrived, she heard a "thud" and a scream and Beard immediately told her that they needed to get out of the house. The two ran to a neighbor's yard where they waited approximately 45 minutes for "things to cool down." Vannoy testified that they did not call for help because their phone did not work. Upon returning to the house, Wilson was on the couch with something cold pressed to her head. Vannoy saw that Wilson was frightened and had scratches on her neck. Vannoy testified that the next morning she and Beard drove Goode's car to the gas station after Goode made a comment about Wilson going to the police.

The State also called the responding police officer, Steve Manley, and a strangulation expert, Dr. David Dolinak, as witnesses. Manley testified to Wilson's injuries, while Dolinak provided an explanation as to the mechanics of strangulation. Goode presented no evidence. The jury convicted Goode of family-violence aggravated assault with a deadly weapon and retaliation. His

5

punishment range was enhanced by two prior felony offenses: possession of a firearm by a felon and felony retaliation. After hearing evidence of several prior incidents of assault, the trial court sentenced Goode to two concurrent 45-year sentences. Goode now appeals, alleging that the evidence is: (1) factually insufficient to support the jury's conclusion that Goode strangled Wilson, (2) factually insufficient to support the jury's conclusion that Goode's hands were used as deadly weapons, and (3) legally insufficient to support the jury's conclusion that Goode retaliated against Wilson.

## STANDARD OF REVIEW

Goode challenges the factual sufficiency of the evidence supporting his aggravated assault with a deadly weapon conviction. He also challenges the legal sufficiency of the evidence supporting his retaliation conviction. In light of the Texas Court of Criminal Appeals' recent opinion in *Brooks v. State*, we will construe all of Goode's arguments as challenges to the legal sufficiency of the evidence. 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) ("[T]he *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether evidence is sufficient to support each element of a criminal defense . . . .").

In reviewing a challenge to the legal sufficiency of the evidence, we examine the evidence to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Id.*; *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). We review all the evidence in the light most favorable to the verdict, and assume the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *see also Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009).

6

# DISCUSSION

In three points on appeal, Goode challenges the sufficiency of the evidence supporting the jury's conclusions that (1) Goode strangled Wilson with his hands, (2) Goode's hands were used as a deadly weapon, and (3) Goode threatened to harm Wilson in retaliation for her status as a person who had reported or intended to report a crime.

To prove aggravated assault with a deadly weapon, the State was required to prove beyond a reasonable doubt that Goode intentionally, knowingly, or recklessly caused bodily injury to Wilson by strangling her with his hands and that he used or exhibited a deadly weapon, his hands, which in the manner of their use and intended use were capable of causing death and serious bodily injury, during the commission of the assault. *See* Tex. Penal Code Ann. § 22.01(a)(1) (West 2003).

In his first point of error, Goode claims that the evidence was insufficient to show that he strangled Wilson with his hands. Goode argues that the State's only evidence of strangulation came from Wilson's testimony, which is suspect because she admitted that she had smoked marijuana in the past. Goode further notes that the State's strangulation expert, Dolinak, testified that it was possible that Wilson could have sustained her injuries in a way other than manual strangulation.

The record does not support Goode's contention that the State's "only evidence of strangulation" was from Wilson herself. The State also introduced photographs of Wilson's injuries, taken by the police, which portrayed scratches and bruising on her ear, neck, chest, arms, and legs. Though Dolinak did concede that Wilson's injuries could have occurred without strangulation, he also testified that Wilson's injuries were consistent with manual strangulation and that the bruises on her neck indicated that pressure had been applied to it "to such an extent that it damaged the skin and other tissues." He testified that had the pressure to her neck continued, Wilson would have died.

7

Dolinak also stated that in his work as a medical examiner, he has seen individuals with fewer outward injuries who died of strangulation. Manley, the responding police officer, also testified to scratches, abrasions, and bruises on Wilson's neck, ear, chest, legs, and shoulder. He testified that while at the hospital, Wilson was shaking, crying, and appeared frightened.

Wilson's account of the evening was also corroborated by Vannoy, who testified to hearing Wilson scream and later seeing the injuries on her neck. Goode himself stated to Wilson in a phone conversation from jail, "I remember when you snapped in the room and I grabbed your neck."

Furthermore, even had Wilson's testimony not been corroborated, it is the role of the factfinder to judge the credibility of a witness and the weight to be given her testimony. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Goode argues that Wilson's statement that she and her friends would "hang out [and] smoke weed" at the lake somehow made her less reliable as a witness. However, Goode failed to present any explanation as to how this statement impacted Wilson's ability to testify to the assault.[3] As the factfinder, it is the jury's decision whether to believe Wilson's testimony. We conclude that a rational jury could have found beyond a reasonable doubt that Goode strangled Wilson with his hands. Goode's first point of error is overruled.

In his second point of error, Goode argues that the evidence is insufficient to support the jury's conclusion that he used his hands as a deadly weapon. The code of criminal procedure authorizes a deadly weapon finding upon sufficient evidence that a defendant used or exhibited a deadly weapon during the commission of or flight from a felony offense. Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 2010); *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App.

---

[3] There is nothing in the record that suggests that Wilson used illegal drugs on the night of the assault.

8

2005). A deadly weapon is anything that "in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B) (West Supp. 2010); *Drichas*, 175 S.W.3d at 798.

While hands are not a deadly weapon per se, a jury may find that they were used as a deadly weapon based upon their manner of use or intended use and their capacity to produce death or serious bodily injury. *See Turner v. State*, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983). The State need not show that the hands actually caused serious bodily injury so long as the evidence shows that the hands in the manner of their use were capable of causing serious bodily injury. *Jefferson v. State*, 974 S.W.2d 887, 892 (Tex. App.—Austin 1998, no pet.). Evidence that hands were used to choke or strangle someone is sufficient to support a finding that the hands were deadly weapons. *See Judd v. State*, 923 S.W.2d 135, 140 (Tex. App.—Fort Worth 1996, pet. ref'd) (hand used as deadly weapon when death caused by manual strangulation); *Shockley v. State*, 747 S.W.2d 470, 474 (Tex. App.—Houston [1st Dist.] 1988, no pet.) (hands used as deadly weapon in murder by strangulation); *see also Wilford v. State*, No. 03-07-00326-CR, 2008 Tex. App. LEXIS 7494, at *8 (Tex. App.—Austin Aug. 29, 2008, no pet.) (mem. op., not designated for publication) (hands used as deadly weapon in aggravated assault case where defendant choked victim).

At Goode's trial, Wilson testified that Goode punched her on the side of her head with a closed fist and then placed both hands around her neck and strangled her. She testified that she was "gasping for air" and thought she was going to die. Dr. Dolinak testified that bare hands are capable of causing death or serious bodily injury. Further, he stated that had the manual strangulation continued, Wilson would have died. Reviewing this evidence in the light most favorable to the conviction, the jury could have rationally concluded that Goode's hands, in the manner they

9

were used against Wilson, were capable of causing serious bodily injury. We overrule Goode's second point of error.

In his third point of error, Goode contends that there is insufficient evidence to support the finding that he threatened to harm Wilson in retaliation for or on account of her status as a person who he knew intended to report a crime. Goode argues that, though there was testimony suggesting that he threatened Wilson's family, there is no evidence that he made any threats against Wilson herself. Additionally, he claims that to the extent that any statements could be construed as death threats against Wilson, they were motivated by the desire to keep Wilson in a relationship with Goode, rather than as retaliation.

A person commits retaliation "if he intentionally or knowingly harms or threatens to harm another by an unlawful act . . . in retaliation for or on account of the service or status of another as a . . . person who has reported or who the actor knows intends to report the occurrence of a crime." Tex. Penal Code Ann. § 36.06(a)(1)(B). Retaliatory intent may be inferred from an accused's acts, words, or conduct. *In re B.P.H.*, 83 S.W.3d 400, 407 (Tex. App.—Fort Worth 2002, no pet.) (citing *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. 1982)).

Wilson testified that during the incident, Goode told her, "You're going to die tonight." When she attempted to unlock her phone, he further stated, "I have my guns in the house. Go ahead and call 911, bitch. Everybody will die if you do." Wilson also testified that the next morning, Goode told her he would "kill [her] and [her] whole family" if she went to the police, and later sent her text messages containing photographs of her friend's and mother's houses and the messages "1st" and "2nd." Vannoy also testified that Goode rode in Wilson's car because he was worried about Wilson calling the police.

10

Additionally, the jury reviewed other text messages and voicemails from Goode to Wilson in the days after the incident. One text message read, "U piece of shit bitch . . . tha police cant do shit 2 stop al mite stop me but not my soldiers." The jury also heard a voicemail to Wilson, in which Goode stated, "You don't need me as an enemy. You do not need me as a fucking enemy. I will start with your littlest family member, bitch. . . . You put the police in my life, everybody you know will die. Everybody. I don't care no more."

From this evidence, a rational jury could conclude that Goode's statements that "everybody will die" if Wilson called 911 and that he "will kill [Wilson] and [her] whole family" if she went to authorities constituted retaliation. *See* Tex. Penal Code Ann. § 36.06. Therefore, the evidence is legally sufficient to support Goode's retaliation conviction. Goode's third point of error is overruled.

## CONCLUSION

Because the evidence is legally sufficient to support the jury's verdicts, we affirm the trial court's judgments of conviction.

_____

Diane M. Henson, Justice

Before Justices Pemberton, Henson and Goodwin

Affirmed

Filed: February 9, 2011

Do Not Publish

11